UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**THE OTOE-MISSOURIA TRIBE,** a federally-recognized Indian Tribe; **GREAT PLAINS LENGING, LLC,** a wholly-owned tribal limited liability company; **AMERICAN WEB LOAN, INC.,** a wholly-owned tribal corporation; **OTOE-MISSOURIA CONSUMER FINANCE SERVICES REGULATORY COMMISSION,** a tribal regulatory agency; **LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS,** a federally-recognized Indian Tribe; **RED ROCK TRIBAL LENDING, LLC,** a wholly-owned tribal limited liability company; and **LAC VIEUX DESERT TRIBAL FINANCIAL SERVICES REGULATORY AUTHORITY,** a tribal regulatory agency,

NO. 13-CV-5930-RJS

Plaintiffs,

vs.

**NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES;** and **BENJAMIN M. LAWSKY,** in his official capacity as Superintendent of the New York State Department of Financial Services,

Defendants.

---

# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Table of Authorities .................................................................................................. ii

Preliminary Statement ............................................................................................. 1

Statement of Facts ................................................................................................... 2

Argument .................................................................................................................. 8

    I.    The Tribes Will Suffer Irreparable Injury ............................................... 8

    II.    The Tribes Have a Likelihood of Success on the Merits ....................... 13

        A.    The Tribes Enjoy Sovereignty Over Economic Activity
            Occurring Within Their Jurisdiction ........................................... 13

        B.    The Tribes' Sovereign Authority Extends to All Economic Activity In
            Their Jurisdiction, Including the Right to Regulate Non-Indians ............ 16

        C.    The Business of the Tribal Corporate Plaintiffs Is Conducted on
            the Reservation and Is Governed By Tribal, Not State, Law ................... 18

        D.    The Balance of Hardships Clearly Favors the Tribes .............................. 20

Conclusion ............................................................................................................. 21

## TABLE OF AUTHORITIES

### CASES

*Allen v. Gold Country Casino,*
   464 F.3d 1044 (9th Cir. 2006) ............................................................................. 14

*Am. Booksellers Found. v. Dean,*
   342 F.3d 96 (2d Cir. 2003) .................................................................................... 18

*Am. Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe,*
   780 F.2d 1374 (8th Cir. 1985) .............................................................................. 11

*Atascadero State Hosp. v. Scanlon,*
   473 U.S. 234 (1985) .............................................................................................. 14

*Backpage.com, LLC v. Cooper,*
   2013 WL 1558785  (M.D. Tenn. Jan. 3, 2013) ................................................. 18-19

*Breakthrough Mgmt. Group, Inc. v. Chukchansi Gold Casino and Resort,*
   629 F.3d 1173 (10th Cir. 2010) ........................................................................ 11, 14

*California v. Cabazon Band of Mission Indians,*
   480 U.S. 202 (1987) .............................................................................................. 11

*Ctr. for Democracy and Technology v. Pappert,*
   337 F. Supp. 2d 606 (E.D. Pa. 2004) ............................................................... 18-19

*Cherokee Nation v. Georgia,*
   30 U.S. 1 (1831) ................................................................................................... 13

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin,*
   – F.3d –, 2013 WL 4081696 (2d Cir. Aug. 14, 2013) .......................................... 12

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
   559 F.3d 110 (2d Cir. 2009) ................................................................................... 8

*Fed. Trade Comm'n v. Payday Financial, LLC,*
   – F. Supp. 2d –, 2013 WL 1309437 (D.S.D., Mar. 28, 2013) ........................... 19-20

*Fine Consulting, Inc. v. Rivera,*
   915 F. Supp. 2d 1212 (D.N.M. 2013) .................................................................. 17

*Fox Drywall & Plastering, Inc. v. Sioux Falls Construction Co.,*
   2012 WL 1457183 (D.S.D. Apr. 26, 2012) ........................................................................ 17

*Garcia v. Akwesasne Hous. Auth.,*
   268 F.3d 76 (2d Cir. 2001) ................................................................................................ 14

*Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc.,*
   715 F.3d 1196 (9th Cir. 2013) .......................................................................................... 16

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) .......................................................................................................... 14

*Healy v. Beer Inst.,*
   491 U.S. 324 (1989) .......................................................................................................... 18

*Lusk v. Vill. of Cold Spring,*
   475 F.3d 480 (2d Cir. 2005) ................................................................................................ 8

*McClanahan v. State Tax Comm'n,*
   411 U.S. 164 (1973) .......................................................................................................... 14

*Memphis Biofuels, LLC v. Chickasaw Nation Indus., LLC,*
   585 F.3d 917 (6th Cir. 2009) ........................................................................................ 14-15

*Midwest Title Loans, Inc. v. Mills,*
   593 F.3d 660 (7th Cir. 2010) ........................................................................................ 4, 19

*Montana v. United States,*
   450 U.S. 544 (1981) ...................................................................................................... 16, 20

*Native Am. Church of N. Am. v. Navajo Tribal Council,*
   272 F.2d 131 (10th Cir. 1959) .......................................................................................... 14

*Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.,*
   546 F.3d 1288 (10th Cir. 2008) ........................................................................................ 15

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.,*
   992 F.2d 430 (2d Cir. 1993) ............................................................................................. 12

*Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.,*
   207 F.3d 21 (1st Cir. 2000) .............................................................................................. 15

*Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,*
   498 U.S. 505 (1991) ..................................................................................................... 11, 13

*Plains Commerce Bank v. Long Family Land & Cattle Co.,*
   554 U.S. 316 (2008) ................................................................................................ 16

*Prairie Band of Potawatomi Indians v. Pierce,*
   253 F.3d 1234 (10th Cir. 2001) ................................................................................. 9

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.,*
   749 F.2d 124 (2d Cir. 1984) ...................................................................................... 12

*Semmes Motors, Inc. v. Ford Motor Co.,*
   429 F.2d 1197 (2d Cir. 1970) .................................................................................... 12

*Seneca Nation of Indians v. Paterson,*
   2010 WL 4027795 (W.D.N.Y. Oct. 14, 2010) ............................................................ 9

*Seneca-Cayuga Tribe v. Oklahoma,*
   874 F.2d 709 (10th Cir. 1989) ......................................................................... 9-10, 12

*Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Eng'g,*
   476 U.S. 877 (1986) .................................................................................................. 14

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
   60 F.3d 27 (2d Cir. 1995) .......................................................................................... 12

*United States v. Michigan,*
   534 F. Supp. 668 (W.D. Mich. 1982) ......................................................................... 9

*Water Wheel Camp Recreational Area, Inc. v. LaRance,*
   642 F.3d 802 (9th Cir. 2011) ..................................................................................... 17

*Williams v. Lee,*
   358 U.S. 217 (1959) .................................................................................................. 14

*Winnebago Tribe v. Stovall,*
   216 F. Supp. 2d 1226 (D. Kan. 2002) ................................................................... 9, 12

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.,*
   339 F.3d 101 (2d Cir. 2003) ....................................................................................... 8

*Worcester v. Georgia,*
   31 U.S. 515 (1832) .................................................................................................... 13

*XL Specialty Ins. Co. v. Global Invs., L.P.,*
   874 F. Supp. 2d 263, 270 (S.D.N.Y. 2013) ................................................................... 8


**STATUTES**

12 U.S.C. § 5495 ........................................................................................................... 15

12 U.S.C. § 5512 ........................................................................................................... 15

12 U.S.C. § 5481 ........................................................................................................... 15

25 U.S.C. § 2702 ............................................................................................................. 3

Pub. L. No. 111-203, Stat. 1376 (2010) ........................................................................ 15


**OTHER AUTHORITIES**

*Cohen's Handbook of Federal Indian Law* (LexisNexis 2012) ............................... 4-5, 13-14

S. Bair, *Bank/Credit Union Entry in to the Payday Loan Market* ....................................... 3

D. Morgan and M. Strain, *Payday Holiday:  How Households Fare After Payday Credit Bans,*
   Nov. 2007; revised Feb. 2008 ........................................................................................ 4

The Plaintiffs, federally-recognized Indian Tribes ("Tribes"), limited-liability companies wholly owned by the Tribes ("Tribal Corporate Plaintiffs"), and the Tribe's regulatory entities ("Tribal Regulatory Plaintiffs") (all hereinafter the "Tribal Entities") submit this Memorandum of Law in Support of their Motion for a Preliminary Injunction to enjoin Defendants from further interfering with the sovereign acts of the Tribal Entities in lending funds to persons who wish to do business with the Tribal Entities in accordance with Tribal law and subject to Tribal jurisdiction.

## PRELIMINARY STATEMENT

This is an action to protect the sovereign rights of Native American Tribes and wholly-owned Tribal Entities from an attempt by Defendants to impose New York State usury laws on activities conducted by these Tribal Entities on tribal property expressly pursuant to tribal law. Under well-established federal case law, these Tribes, as sovereign entities, are free to pursue all activities that promote the economic development of their people provided that they have not been proscribed by Congress. As entities which preexisted the United States, the Tribes have been recognized consistently as sovereign entities, and Congress has acted to protect the rights of tribes to engage in their own self-determination. Individuals who choose to do business with tribes are, pursuant to written agreements they voluntarily enter into, properly subject to tribal laws and tribal jurisdiction, limited only by the acts of Congress. The State of New York has no power to dictate the terms on which members of the Plaintiffs' Tribes do business with citizens of New York or with citizens of any other state.

In direct contravention of this well-established law, Defendant Lawsky has threatened hundreds of banks that do business with the Tribal Entities with enforcement action should they refuse to "choke off" the Tribal Entities and cease doing business with them. This brazen

assertion of power and willful attempt to interfere with both tribal economic sovereignty and interstate commerce is patently in violation of the inherent sovereignty of Indian tribes, the Indian Commerce Clause of the United States Constitution and over 200 years of Supreme Court jurisprudence recognizing that sovereign authority. Yet banks and financial services entities that do business with Plaintiffs have already suggested to the Tribes that they will cut off their access to the banking system in a matter of days in response to Defendants' demands. This will result in an immediate cessation of funds to numerous tribal programs that are critical to the well-being of members of the Tribes and the economic viability of the Tribes themselves.

## STATEMENT OF FACTS

The Tribes are federally-recognized Indian tribes that share a special government-to-government relationship with the United States. In exercising their sovereignty, the Tribes have enacted tribal regulatory codes and ordinances in accordance with Tribal law, which codes and ordinances allow for the creation and regulation of tribal lending enterprises. *See* Aug. 20, 2013 Declaration of John Shotton (hereinafter "Shotton Decl.") at ¶¶ 17-19; Aug. 22, 2013 Declaration of James Williams Jr. (hereinafter "Williams Decl."), at ¶¶ 11-18. The Tribes have created the Tribal Regulatory Plaintiffs which regulate their respective Tribal Corporate Plaintiffs in accordance with their tribal laws. *See* Shotton Decl. at ¶¶ 17-19; Williams Decl. at ¶¶ 16-17. Each Tribal Corporate Plaintiff is 100% owned and operated by the respective Tribe. *See* Shotton Decl. at ¶¶ 17-19; Williams Decl. at ¶ 20.

It has long been the goal of Congress to support Indian sovereignty so as to encourage Indian economic development. *See* Aug. 18, 2013 Declaration of Barry Brandon (hereinafter "Brandon Decl."), at ¶¶10-23. Many tribes have been able to do this through the Indian Gaming and Regulatory Act ("IGRA"), which has allowed Indian tribes to improve their economic

condition by engaging in commerce with other citizens in the United States.[1] *Id.* at 16-21. But many tribes are unable to take advantage of gaming for the purpose of economic development because they are located in isolated geographic locations. *Id.* at ¶¶ 21-25; Aug. 21, 2013 Declaration of Dr. Katherine Spilde (hereinafter "Spilde Decl."), at ¶ 17.  Instead, these tribes have gravitated towards e-commerce, whereby they offer economic opportunities to citizens around the United States to do business with Indian tribes.  Brandon Decl. at ¶¶ 25-31; Spilde Decl. at ¶ 17.  The Plaintiff Tribes are among those which have developed online lending as a means to further economic growth.   Shotton Decl. ¶¶ 22-31; Brandon Decl. at ¶¶ 25-31; Williams Decl. at ¶¶ 15, 23-26.  The Plaintiff Tribes, along with many other tribes, have formed the Native American Financial Services Association ("NAFSA") an association of federally-recognized tribal governments which offer a range of online lending services for the purpose of sharing best practices and regulatory models.   Brandon Decl. at ¶ 1.  These tribes offer short-term, modest loans to consumers who are in need of immediate funds and for whom overdraft charges are prohibitively expensive.  Brandon Decl. at ¶¶ 25-26; Aug. 21, 2013.  According to Sheila Bair, then-head of the Federal Deposit and Insurance Corporation, the prohibitive cost of over-draft charges has caused consumers to turn to payday credit for their "cheaper product" when they are in need of modest but immediate funds.[2]  Although Defendant Lawsky has attacked these loans as predatory, a study conducted by the Federal Reserve Bank of New York found that, in states where short-term consumer lending is not permitted, most households "have

---

[1]  *See* 25 U.S.C. § 2702(1) (Indian Gaming Regulatory Act is designed to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency and strong tribal governments.").

[2]  S. Bair, *Bank/Credit Union Entry in to the Payday Loan Market*, http://www.chicagofed.org/digital_assets/others/events/2005/promises_and_pitfalls/presentation _blair.pdf (last visited Aug. 23, 2013).

bounced more checks, complained more to the Federal Trade Commission about lenders and debt collectors, and filed for Chapter 7 bankruptcy protection at a higher rate." Further, the study found that "[t]his negative correlation – reduced payday credit supply, increased credit problems – contradicts the deathtrap critique of payday lending, but is consistent with the hypothesis that payday credit is preferable to substitutes such as the bounced-check 'protection' sold by credit unions and banks or loans from pawn shops." D. Morgan and M. Strain, *Payday Holiday: How Households Fare After Payday Credit Bans*, Nov. 2007; revised Feb. 2008.[3] *See also Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 664 (7th Cir. 2010) (citing sources discussing benefits of payday loans).

Not only have these online lending programs assisted consumers with their short-term credit problems, they have resulted in a vital economic benefit for the Tribes engaging in this commerce and most particularly for the Plaintiff Tribes. Brandon Decl., at ¶¶ 27-28; Declaration of Sherry Treppa (hereinafter "Treppa Decl.") at ¶¶ 27-29; Shotton Decl. at ¶¶ 22-31; Williams Decl. at ¶¶ 15, 23-26. This Court does not need to be reminded of the long history of broken promises, resettlement, confiscation of land, and paternalistic politics of the federal government that lead to severe poverty and lagging economic opportunity on Indian lands. Brandon Decl. at ¶¶ 10-15; Treppa Decl. at ¶¶ 7-16. But the federal government has now recognized that the best path to Indian prosperity is self-determination and the development of tribally-sponsored business. Brandon Decl. at ¶¶ 14-15; *Cohen's Handbook of Federal Indian Law* § 21.01[1][a] at 1320 (LexisNexis 2012) ("The Indian Reorganization Act of 1934 (IRA) sought to . . . improve tribal economic conditions by reviving tribal governments and chartering tribal business entities that would engage in economic development . . . . With the emergence of self-determination and

---

[3] http://ftp.ny.frb.org/research/staff_reports/sr309.pdf (last visited August, 22, 2013).

its attendant emphasis on tribal control, sustained economic development for Native American nations has begun to take hold once again.").

That is exactly what the e-commerce of the Plaintiff Tribes has accomplished. For example, for the Otoe-Missouria Tribe, internet commerce accounts for close to half of the Tribe's non-federal budget. Shotton Decl. at ¶¶ 22-31. It has created dozens of jobs on Tribal land and has supported a wide range of social and economic services including: funding for housing and renovation, additional funds for classrooms, books and teachers, funds for childcare services and employment, natural resource development, financial assistance and utility assistance, healthcare and wellness coverage and emergency assistance. *Id*. It has also provided funds for child protection, low-income housing, energy assistance program, and family violence protection. *Id*. The other Tribes have experienced similar economic gains through their e-commerce programs.

The Tribes play a critical role in the lending operations of the Tribal Corporate Plaintiffs. *See* Shotton Decl. at ¶¶ 20-21; Williams Decl. at ¶ 20. The operation run by the Otoe-Missouria Tribe of Indians is typical: the loan application process takes place through a website owned and controlled by the Tribe and the website explicitly informs customers that loans are subject to the exclusive laws and jurisdiction of the Tribe. *Id*. Potential consumers fill out an application and the application is reviewed and assessed by the Tribal loan underwriting system. *Id*. The loans are funded by Tribally-owned bank accounts. *Id*. The function of the Tribal Corporate Plaintiffs is regulated by the Tribal Regulatory Plaintiffs. *Id*. at ¶¶ 18-19. Acting from Tribal land, the Tribe has the ultimate authority over all aspects of the loan process and are directly involved in that process. *See* Shotton Decl., at ¶¶ 20-21.

Defendants, however, have taken steps to stop such lending, not only to New York consumers, but effectively to all consumers in the United States.  Shotton Decl. at ¶¶ 32-35; McGreevy Decl. at ¶¶ 16-19; Williams Decl. ¶¶ 27-33.  On August 5, 2013, Defendant Lawsky sent a letter to 35 lending companies, including the Tribal Corporate Plaintiffs, demanding that they "Cease and Desist [from] offering and originating illegal payday loans in New York." Brandon Decl. at ¶37; Shotton Decl. at ¶ 32 and Exh. B thereto.  Mr. Lawsky further demanded that the Tribal Corporate Plaintiffs provide written confirmation they would cease from making "illegal payday loans in New York" and stated that a failure to comply with would result in their "tak[ing] appropriate action to protect New York consumers."  Brandon Decl. at ¶ 37.

On the same date, Mr. Lawsky took the further step of sending letters to 117 banks stating that Defendants were conducting an investigation into "illegal online payday lending." Brandon Decl. at ¶ 37; Shotton Decl. at ¶ 33 at Exh. C thereto.  Mr. Lawsky named Tribal Corporate Plaintiffs as four of the 35 lending entities that "solicit and provide illegal payday loans to consumers in New York" and stated that New York would "aggressively pursue appropriate enforcement" against such lenders, including the Plaintiffs.  *Id.*  The letter went on to state that these purported illegal payday loans were made possible by credit and debits that must pass through the Automated Clearing House ("ACH") and that the current ACH network allows "illegal loans" to flow through New York without sufficient mechanisms to prevent or block these debits and credits as they occur.  *Id.*  Mr. Lawsky, therefore, asked the banks to cooperate with him to create procedures that would "choke off ACH access to the 35 illegal lenders" and represented that it was in the banks' interests to "take appropriate action to help ensure that [they are] not serving as a pipeline for illegal conduct."  *Id.*  Mr. Lawsky also asked the banks to provide information about the current procedures to stop "illegal payday loans from entering into

New York through the ACH network," as well as any changes that would be necessary to stop such loans. *Id.*

Finally, Mr. Lawsky stated that "[t]hrough a cooperative effort with the banking industry, we can work together to stamp out these pernicious, illegal payday loans in New York." Exh. C. to Shotton Decl.

On August 5, 2013, Mr. Lawsky sent a similar letter to the National Automated Clearing House Association ("NACHA"), a non-profit association of financial institutions which administers the ACH network, similarly asking NACHA to "choke off ACH access" to the "illegal lenders" identified by Mr. Lawsky. Shotton Decl. at ¶ 34 and Exh. D thereto. Mr. Lawsky also sent several letters to debt collection companies operating in New York stating that Plaintiffs were involved in "criminal usury" and noting that Mr. Lawsky sent letters to 35 payday loan companies "directing them to cease and desist offering and making usurious payday loans in New York." Shotton Decl. at ¶ 35, and Exh. E thereto.

As a result of Mr. Lawsky's direct and intentional interference with the activities of the Tribes, several major payment processors issued a notification to the Tribes and others stating that they would unilaterally cease processing transactions involving consumers located in New York and other states. Specifically, InterceptEFT, a major third-party payment processor, advised the Tribes of its intent to close the Tribes' accounts effective August 30, 2013. Brandon Decl. at ¶ 45.

Further, on August 9, 2013, the Tribes were notified that NACHA's general counsel sent several letters to banks processing payments for the Tribes informing the banks that they either (a) need to immediately stop processing payments for such tribal lending entities, or (b) inform NACHA why such payment processing is lawful. The NACHA letter was sent to the same 117

banks listed in Mr. Lawsky's letter. In addition, on August 10, 2013, NACHA sent its letters to its member financial institutions, citing Mr. Lawsky's August 5, 2013 letter, stating that "[i]f [Mr. Lawsky's] allegations [are correct] then origination of ACH debits to the account of New York consumers for such loans would violate the NACHA Rules." NACHA's letter demanded its member institutions "immediately review [their] origination activity for [the Tribes] and terminate any origination that would otherwise violate the NACHA Rules …. We appreciate your cooperation in this important effort to stamp out the use of the ACH Network for illegal purposes." Brandon Decl. at ¶46.

## ARGUMENT

"To obtain a preliminary injunction a party must demonstrate: (1) that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardship tipping decidedly in its favor." *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2005) (internal quotation omitted).

### I. The Tribes Will Suffer Irreparable Injury.

To satisfy the irreparable harm requirement, a moving party must show that, absent injunctive relief, it will suffer a harm that is "actual and imminent" and for which "a monetary award does not adequately compensate." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). "The Second Circuit has repeatedly emphasized that '[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'" *XL Specialty Ins. Co. v. Global Invs., L.P.*, 874 F. Supp. 2d 263, 270 (S.D.N.Y. 2013) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).

Here, the failure to enjoin Defendants' actions will substantially and irreparably harm Plaintiffs in two distinct and fundamental ways.

First, Defendants' efforts, in violation of federal law, to regulate (and punish) tribal entities have already impaired and threatened to abrogate entirely Plaintiffs' tribal sovereignty with respect to lending. "Where, as here, enforcement of a statute or regulation threatens to infringe upon a tribe's right of sovereignty, federal courts have found the irreparable harm requirement satisfied." *Seneca Nation of Indians v. Paterson*, 2010 WL 4027795, at *2 (W.D.N.Y. Oct. 14, 2010); *see also Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250-51 (10th Cir. 2001) (finding irreparable injury where state regulation created the "prospect of significant interference with [tribal] self-government" and because "monetary relief might not be available to the tribe because of the state's sovereign immunity"); *Seneca-Cayuga Tribe v. Oklahoma*, 874 F.2d 709, 716 (10th Cir. 1989) (finding irreparable injury where state regulation threatened loss of revenues and jobs and created the "prospect of significant interference with [tribal] self-government"); *Winnebago Tribe v. Stovall*, 216 F. Supp. 2d 1226, 1233 (D. Kan. 2002) (finding irreparable injury where Kansas's attempt to tax Indian nation would result in loss of revenues and resulting inability to fund tribal government programs); *United States v. Michigan*, 534 F. Supp. 668, 669 (W.D. Mich. 1982) (protecting tribal rights under treaty "to the fullest extent possible" encouraged "the concept of tribal sovereignty," and the denial of those rights is presumed to cause irreparable harm).

In *Seneca-Cayuga Tribe*, for example, the district court preliminarily enjoined state officials from shutting down bingo games being held on reservation land. In upholding the injunction on appeal, the Tenth Circuit explained that, without a preliminary injunction, the tribe's ability to govern itself would be irreparably harmed because it "would lose income used

to support social services for which federal funds have been reduced or are non-existent, and lose jobs employing Indians who face a rate of unemployment ranging from thirty-five percent (the Seneca-Cayuga Tribe) to close to fifty percent (the Quapaw Tribe)." 874 F.2d at 716. The court thus concluded that a preliminary injunction "promotes the paramount federal policy that Indians develop independent sources of income and strong self-government." *Id.*

Here, the Plaintiff Tribes have already been directly and adversely affected by Defendants' actions. Although Defendants have absolutely no power to constrain the sovereign rights of the Tribal Entities, they have interfered with that sovereignty by asserting that the Tribes are improper governmental bodies to regulate the Tribal Corporate Plaintiffs' business practices and by demanding that banks prevent the Tribes' ability to transfer funds through the interstate banking network. Several banks and financial services companies *have already* informed Tribal Corporate Plaintiffs that they will terminate their accounts, and more likely will – blindly – follow suit if Defendants are not enjoined. Third-party payment processors ("TPPPs"), the Tribal Corporate Plaintiffs' main access point to the ACH network, are citing the Defendant Lawsky's actions and correspondence as the impetus for terminating agreements and severing relationships with Tribal Corporate Plaintiffs. InterceptEFT has already contacted a Tribal Corporate Plaintiff, and stated that the tribes must "cease submitting any transactions involving NY residents to InterceptEFT for processing." Brandon Decl. at ¶45. In addition, InterceptEFT recently cancelled its existing agreements with various financial institutions that directly lend to Plaintiffs, citing "heightened regulatory attention to the online consumer lending industry." *Id.* In response to Lawsky's demands, NACHA has also contacted several of its member institutions that process payments for tribes, strongly suggesting that they stop

processing payments for tribal lending enterprises, despite the fact that such enterprises are legally conducted and regulated pursuant to Tribal law.

Further, Defendants have threatened to take legal action against Plaintiffs, notwithstanding Plaintiffs' status as sovereign tribes and arms of those tribes, if Plaintiffs do not comply with Defendants' demands. This is an attempt to assert state law over tribally-regulated business and to override the Tribes' sovereignty and applicable laws. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 217 (1987) ("tribal sovereignty is dependent on, and subordinate to, only the federal government, not the States."). It is established law that the Plaintiffs' soverign rights specifically preclude legal action by the Defendants to unlawfully enforce New York State law against the Tribes. As the *Breakthrough* court explained, "[n]ot only is sovereign immunity an inherent part of the concept of sovereignty and what it means to be a sovereign, but 'immunity [also] is thought [to be] necessary to promote the federal policies of tribal self[-]determination, economic development, and cultural autonomy.'" *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino and Resort*, 629 F.3d 1173, 1182 (10th Cir. 2010) (quoting *Am. Indian Agricultural Credit Consortium, Inc. v. Standing Rock Sioux Tribe*, 780 F.2d 1374, 1378 (8th Cir. 1985)). The broad interpretation of tribal sovereign immunity can trace its origins to "Congress' desire to promote the 'goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development.'" *Id.* at 1183 (quoting *Oklahoma Tax Comm'n*, 498 U.S. at 510). The infringement of Plaintiffs' sovereignty has already begun, and the harm that will be caused in the absence of an injunction would be irreparable.

Second, an injunction is necessary to prevent Defendants from irreparably harming Plaintiffs' business relationships (and thereby further damaging Plaintiffs' sovereign rights). If

Defendants are permitted to continue intimidating financial services institutions that process payments for Tribal Corporate Plaintiffs, their legitimate businesses will be destroyed. Driving a party out of business constitutes irreparable harm. *See Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, – F.3d –, 2013 WL 4081696, at *22 (2d Cir. Aug. 14, 2013) (defendant established irreparable harm where state regulation would force it to close power plant); *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993) ("[A] threat to the continued existence of a business can constitute irreparable injury.") (internal quotation omitted); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (The "loss of . . . an ongoing business representing many years of effort and the livelihood of its . . . owners, constitutes irreparable harm" that cannot be monetarily compensated.); *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (finding irreparable harm in part because "the right to continue a business 'is not measurable entirely in monetary terms.'") (quoting *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970)).

As indicated above, however, an even greater harm is threatened here because if Plaintiffs were forced to discontinue their e-commerce activities, Plaintiffs would be deprived of the ability to fund the vital tribal operations and services offered for the benefit of their tribal membership – including but not limited to healthcare, tribal housing, elder care and education. Plaintiffs cannot be monetarily compensated for the harm caused by Defendant's continued activity. *Seneca-Cayuga Tribe of Oklahoma*, 874 F.2d at 716 (injunction necessary to preserve source of income that Tribe needed to support social services and jobs on the reservation); *Winnebago Tribe*, 216 F. Supp. at 1233 (injunction necessary to protect "plaintiffs' ability to carry on essential tribal services."); Brandon Decl. at ¶¶ 42-44; Spilde Decl. at ¶ 21, Treppa Decl. at ¶ 31; Shotton Decl. at ¶¶ 38-40.

In sum, Defendants' actions will foreclose the ability of Tribal Corporate Plaintiffs to support the Tribes and their Tribal memberships generally – the predominant purpose of Tribal Corporate Plaintiffs' formation and activity. Brandon Decl. at ¶¶ 41-44; Shotton Decl. at ¶¶ 38-40. Tribal Corporate Plaintiffs are clearly experiencing harm already as a result of Defendants' acts as they relate to their vendor, bank and TPPP relationships; they should not have to wait until their businesses are irreparably damaged or destroyed to demonstrate the harm sustained at the hands of the Defendants. Additionally, continued assertion of jurisdiction over activity controlled by Tribes and Tribal Regulators threatens the federal government's long-held respect for sovereignty and self-determination for federally recognized tribes. To allow Defendants to assert State law and regulatory action over transactions and business entities controlled by an independent sovereign and an enforceable, regulated body of law is an affront to sovereignty that runs afoul of the U.S. Constitution and the most basic tenets of federal Indian law and policy.

## II.      The Tribes Have a Likelihood of Success on the Merits.

### A.      The Tribes Enjoy Sovereignty Over Economic Activity Occurring Within Their Jurisdiction.

Indian tribes have been recognized as independent sovereigns since long before the formation of the United States. They are now "'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991) (citing *Cherokee Nation v. Georgia*, 30 U.S. 1, 13 (1831)). They are "distinct, independent political communities, retaining their original natural rights" of self-governance. *Worcester v. Georgia*, 31 U.S. 515, 559 (1832).

"The right of tribes to govern their members and territories flows from a preexisting sovereignty limited, but not abolished, by their inclusion within the territorial bounds of the United States. Tribal powers of self-government are recognized by the Constitution, legislation,

treaties, judicial decisions, and administrative practice . . . . Once recognized by the political body of the United States, a tribe retains its sovereignty until Congress acts to divest that sovereignty." *Cohen's Handbook of Federal Indian Law* § 4.01[1][a] at 207.

"Indian tribes are not states. They have a status higher than that of states. They are subordinate and dependent nations possessed of all powers [except] to the extent that they have expressly been required to surrender them by the superior sovereign, the United States." *Breakthrough t*, 629 F.3d at 1182 (quoting *Native Am. Church of N. Am. v. Navajo Tribal Council*, 272 F.2d 131, 134 (10th Cir. 1959)). Congress has the power to limit the sovereignty of Indian tribes and to regulate their affairs under federal law. But because the Tribes' sovereignty pre-exists the United States and the Constitution, and because the Tribes enjoyed foreign state recognition before this country was even created, congressional enactments are strictly construed *against* limiting tribal authority. *See Gregory v. Ashcroft*, 501 U.S. 452, 469-70 (1991); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 247 (1985). Indeed "[I]n the absence of federal authorization . . . tribal sovereignty, is privileged from diminution by the States." *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 891 (1986).

Absent express authorization by Congress, the States have no power to interfere with Indian tribal sovereignty. Tribes have inherent sovereignty that includes the power to make their own laws and to operate free of state laws and regulations within their own territories. *McClanahan v. State Tax Comm'n*, 411 U.S. 164, 181 (1973); *Williams v. Lee*, 358 U.S. 217, 223 (1959). Further, entities created by the tribe that perform functions on behalf of the tribe and that assist the tribe in its economic development are considered "arms" of the tribe and enjoy full sovereign immunity. *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 84-87 (2d Cir. 2001); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046-47 (9th Cir. 2006); *Memphis Biofuels, LLC*

*v. Chickasaw Nation Indus., LLC*, 585 F.3d 917, 920-21 (6th Cir. 2009); *Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1292-93 (10th Cir. 2008); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 29 (1st Cir. 2000).

The Tribes' sovereignty over their own economic affairs was recognized by Congress in the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank" or "Act"). Congress passed the Act for the purpose of "protect[ing] consumers from abusive financial services practices." Pub. L. No. 111-203, Stat. 1376 (2010). To further that purpose, the Act established the Consumer Financial Protection Bureau ("CFPB") to carry out federal consumer financial laws.

There are three important things Congress did ***not*** do in passing the Act, which belie New York's attempt to exercise regulatory authority of the Tribal businesses. First, Congress did not prohibit the consumer lending practices that the State attacks as "illegal." Second, Congress did not displace state regulations over consumer lending in favor of federal law leaving federal and state governments to act as co-regulators in the consumer lending, going so far as to require the CFPB and state regulators to coordinate their enforcement efforts. *See, e.g.*, 12 U.S.C. §§ 5495 (requiring coordination between CFPB and state regulators) and 5512 (requiring consultation between CFBP and state regulators).

Third, and most critical, the Act did not in any way diminish or extinguish the tribal nations' inherent authority with respect to consumer finance. On the contrary, Congress made clear that it did not intend that the tribal nations be subjected to state regulation when it included "any federally recognized Indian tribe" in the Act's definition of "state." 12 U.S.C. § 5481. The Act's placing of states and Indian tribes on equal footing in the enforcement scheme – treating them both as sovereign regulators to work with the CFPB – left no doubt that the tribal nations

are *regulators* rather than *regulated*.  New York's effort to regulate the consumer lending activities of what Congress has recognized is, at the least, the State's equal sovereign flies in the face of Congress deliberate choices in passing the Act.

**B.     The Tribes' Sovereign Authority Extends to All Economic Activity Within Their Jurisdiction, Including the Right to Regulate Non-Indians.**

The Tribes' sovereign authority extends to all aspects of economic and commercial activity within tribal boundaries, including the power to regulate and apply Indian laws and jurisdiction to non-Indians.  *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 332-33 (2008).  As the Supreme Court has stated:

> [a] Tribe may regulate, through taxation, licensing, or other means, the activities of non-members who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.[4]

*Montana v. United States*, 450 U.S. 544, 565 (1981).

The *Montana* standard has been used in a number of cases to recognize tribal jurisdiction over non-Indians who enter into consensual relationships with the Tribe.  This includes both the authority to regulate and to subject the parties to jurisdiction of tribal courts.  Thus, in *Grand Canyon Skywalk Development, LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1205-06 (9th Cir. 2013), a contractor who voluntarily entered into a contract with the tribe that included reference to being subject to the laws of the tribe, was subject to tribal court jurisdiction.  In fact, the court found that "given the consensual nature of the relationship between the parties and the potential economic impact of the agreement, the tribal court could conclude it has jurisdiction over [the dispute] under either of Montana's exceptions."  *Id.* at 1206.

---

[4]     The second exception under *Montana* gives the tribe "inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  *Id.*

In another case, *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802 (9th Cir. 2011) a non-Indian and his non-Indian corporation were subject to tribal jurisdiction in a breach of lease and trespass case.  The non-Indian was "on notice through the lease's explicit terms that [the leased property], its agents, and employees were subject to [tribal] laws, regulations and ordinances. These facts adequately support the tribal court's conclusion that Johnson had entered into a consensual relationship with the tribe and could reasonably anticipate that the tribe would exercise its jurisdictional authority." *Id.* at 818-19.

In *Fox Drywall & Plastering, Inc. v. Sioux Falls Construction Co.*, 2012 WL 1457183, at *6 (D.S.D. Apr. 26, 2012), the court noted that "a 'consensual relationship' exists if the non-member has expressly consented to a tribe's law or has indirectly consented through his actions." Applying that test, the court held that plaintiff contracting company, which entered into a contract with the tribe to build certain buildings on the reservation, was also subject to tribal court jurisdiction.  Because the plaintiff entered into a contract acknowledging that the owner of the property was the tribe, and that all claims under the contract were subject to tribal court jurisdiction, its claims were within the jurisdiction of the tribe. *See also Fine Consulting Inc. v. Rivera*, 915 F. Supp. 2d 1212, 1227 (D.N.M. 2013) (plaintiffs consented to tribal jurisdiction where they "entered into two contracts with two tribal corporations . . . owned by Buffalo Thunder Development Authority, a political subdivision and unincorporated instrumentality of the Pueblo of Pojoaque").

C.    The Business of the Tribal Corporate Plaintiffs Is Conducted on the
       Reservation and Is Governed By Tribal, Not State, Law.

As is more fully set forth above in the Statement of Facts, the transactions at issue take

place on tribal land, are governed by tribal law, and are under the supervision of tribal officials.

The consumer choosing to enter into the loan transaction agrees to tribal jurisdiction and the

application of tribal law.  Under a long line of cases, it is clear that tribal, and not New York law,

governs this transaction and that New York cannot assert regulatory control over these

transactions.

A state's regulatory scheme cannot interfere with transactions that occur outside the

state.  *See Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).  Defendants' actions are

unconstitutional not only because they attempt to reach transactions occurring on the Plaintiffs'

Tribal lands, but because they attempt to control or prohibit transactions that have no meaningful

nexus to New York State by urging banks and financial service companies to cease doing *all*

business entirely with Plaintiffs.  Knowing that Plaintiffs, as sovereign entities, are outside their

reach, Defendants are seeking to shut down all of Plaintiffs' transactions nationwide through

interference in their business relationships.  In *American Booksellers Foundation v. Dean*, 342

F.3d 96 (2d Cir. 2003), the Second Circuit held that Vermont's attempt to prohibit the

distribution of sexually explicit materials involving minors over the internet violated the

Commerce Clause because it had the practical effect of regulating internet commerce

nationwide, noting that "[b]ecause the internet does not recognize geographic boundaries it is

difficult if not impossible, for a state to regulate internet activities without 'project[ing] its

legislation into other states.'"  Similarly in *Backpage.com, LLC v. Cooper*, 2013 WL 1558785 at

**28-29 (M.D. Tenn. Jan. 3, 2013) and  *Center for Democracy and Technology v. Pappert*, 337

F. Supp. 2d 606, 661-62 (E.D. Pa. 2004) the courts held that Tennessee's and Pennsylvania's

regulation of sex-oriented advertisements over the internet violated the Commerce Clause because they affected not only material coming into these states, but also material being distributed nationwide.

That New York residents choose to do business with the Plaintiffs does not give New York the nexus to regulate Plaintiffs' activities. This fact was made clear in the Seventh Circuit's decision in *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) where the court held that Indiana could not mandate that Illinois's loan companies obtain a license from Indiana and be subject to Indiana's usury laws merely because they made loans to Indiana residents. That attempt was an unconstitutional exercise of extra-territorial jurisdiction, even though, as the court pointed out, the proceeds were likely to be spent in Indiana. *Id.* at 699. Nor, held the court, was the result in any way altered by the fact that Midwest advertised in Indiana, *id.* ("[I]f Indiana cannot prevent Midwest from lending money to Hoosiers in Illinois, it cannot prevent Midwest from truthfully advising them of this opportunity."), or that the collateral was located in Indiana. Those facts just illustrate "that a transaction made in one state can have repercussions in another." *Id.* Although the borrowers in *Midwest* traveled to Illinois to obtain their loan, that fact alone did not appear to be determinative. Rather, it was the fact that the bank was located in Illinois, title to collateral was transferred there, the funds were dispersed there and the loan payment was reviewed there. *Id.*

Consumers in the instant case here travel to Tribal land via the internet, but that makes no difference. In a very recent case, one federal court concluded that it was likely that similar commercial transactions with tribal lenders were governed solely by tribal law, not state law, even though consumers obtained their loan over the internet. *See Fed. Trade Comm'n v. Payday Financial, LLC*, – F. Supp. 2d –, 2013 WL 1309437 (D.S.D. Mar. 28, 2013). The *Payday*

*Financial* court observed that "[w]hen a nonmember enters into a commercial transaction with a tribal member or a reservation-based tribal business, receives a benefit coming from the reservation as a result, and consents in written contract to tribal jurisdiction, that nonmember seems to have engaged in the sort of 'consensual relationship with the Tribe or its members, through commercial dealing' that would subject the nonmember to tribal jurisdiction." *Id.* at *8 (quoting *Montana*, 450 U.S. at 565). The court denied summary judgment to the lender because it was unclear on the papers whether the lender was a true tribal entity, but the court recognized that the consumer's selection, through the internet, of the Indian lender was the equivalent of a borrower traveling onto the reservation and obtaining the loan in person. *Id.* at **11-14. Here, there is no factual ambiguity: the Tribe Corporate Plaintiffs are 100% owned, controlled and regulated by the Tribes.

### D.   The Balance of Hardships Clearly Favors the Tribes.

Granting the Tribes a preliminary injunction will maintain the status quo and will prevent serious disruption to the Tribes' economic lifeblood and a direct, immediate assault on their sovereignty. In contrast, an injunction will have no detrimental impact on Defendants, who have been aware of the Tribes' activities for over a year and almost certainly have been aware of similar payday businesses for much longer. The fact that Defendants decided to wait until now to act is not a reason to expose the Tribes to immediate termination of their business relationships before this Court can have an opportunity to consider the merits of the respective claims. Defendants, apparently recognizing their lack of authority over the Plaintiffs, have instead decided to launch an assault on their sovereignty through a campaign of threats against the Plaintiffs' business partners. That campaign needs to be enjoined while the parties' respective rights and powers are adjudicated.

20

Defendants, of course, will argue that the Tribes' lending activities are causing harm to consumers. However, as noted, the New York Federal Reserve Study demonstrated that consumers in states without access to short-term consumer lending have bounced more checks, complained more the Federal Trade Commission about lenders and debt collectors and have filed for Chapter 7 bankruptcy protection at a higher rate because they are left to the mercy of the traditional banks who charge exorbitant overdraft and other administrative fees to individuals who are temporarily short of funds. Thus, separate and apart from the irreparable injury that is being incurred by the Tribes, it is clear that the public interest will also suffer if access to these short-term consumer loans are choked off by Defendants' actions.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary injunction enjoining Defendant from taking any action to interfere with the lending practices of the Plaintiffs pending final determination of this action.

Dated:  August 23, 2013

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

_____

Of counsel:

Robert A. Rosette
Saba Bazzazieh
ROSETTE, LLP
565 W. Chandler Blvd., Suite 212
Chandler, AZ 85225
Telephone: (480) 889-8990
Facsimile: (480) 889-8998

David M. Bernick
Bar No. DB1234
dbernick@bsfllp.com
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

George F. Carpinello
Bar No. GC4229
gcarpinello@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
30 South Street
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665

Scott E. Gant
sgant@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

Carlos M. Sires
csires@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

*Attorneys for Plaintiffs*