IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **THE OTOE-MISSOURIA TRIBE OF INDIANS,** a federally-recognized Indian Tribe; **GREAT PLAINS LENDING, LLC,** a wholly-owned tribal limited liability company; **AMERICAN WEB LOAN, INC.,** a wholly-owned tribal corporation, and **OTOE-MISSOURIA CONSUMER FINANCE SERVICES REGULATORY COMMISSION,** a tribal regulatory agency; **LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS,** a federally-recognized Indian Tribe; **RED ROCK TRIBAL LENDING, LLC,** a wholly-owned tribal limited liability company; **LAC VIEUX DESERT TRIBAL FINANCIAL SERVICES REGULATORY AUTHORITY,** a tribal regulatory agency, <br><br> Plaintiffs, <br><br> vs. <br><br> **NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES; BENJAMIN M. LAWSKY,** in his official capacity as Superintendent of the New York State Department of Financial Services, <br><br> Defendants. | Case No: 13-cv-5930 <br><br> DECLARATION OF JOHN SHOTTON IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION |

I, John Shotton, hereby declare:

1. I have personal knowledge of the facts stated herein and would be competent to testify as to those facts if called upon to do so in a court of law or administrative proceeding.

2. I serve as the elected Chairman of the Otoe-Missouria Tribe of Indians (the "Tribe"), a federally recognized Indian tribe and have served in this capacity since 2007. Attached hereto as Exhibit A is a true and correct copy of the Department of the Interior's List of Federally Recognized Tribes, 78 Fed. Reg. 26384 (May 6, 2013).

3. I also serve as the Secretary/Treasurer of Great Plains Lending, LLC ("Great Plains")

and American Web Loan, Inc. ("AWL"), two wholly Tribally-owned and operated Tribal businesses engaged in consumer finance for the benefit of the Tribe and its citizens. In my capacity as Vice-President, I remain informed and abreast of issues related to the continued successful operation of these Tribally-owned businesses.

4. On February 4, 1984, the Tribe adopted the Constitution of the Otoe-Missouria Tribe of Indians as the supreme law governing all affairs of the Tribe.

5. Under Article IV, Section 1 of the Tribe's Constitution, the Tribal Council, of which I am Chairman, serves as the Tribe's governing body.

6. Under the Constitution, the Tribe's governing body—the Tribal Council—has the power to make all laws and ordinances for the benefit of the Tribe.

7. The Tribe is a Red Rock, Oklahoma-based Native American Tribe with nearly 3,000 members.

8. The Tribe faces the unfortunate struggles common to many Indian tribes today: high unemployment rates, limited opportunities, and a lack of access to fundamental resources.

9. In 2000 and 2007, the Tribe opened two casinos, for the purposes of generating reliable sources of revenue for the Tribal government.

10. In recent years, however, competitors have opened casinos in relatively close proximity to the Tribe's casinos, making it imperative that the Tribe find additional ways to relieve our gaming operations of the disproportionate burden of providing for our members.

11. The Tribal Council exercised its Constitutional power and adopted the Otoe-Missouria Tribe of Indians Limited Liability Company Act on May 4, 2011, and the Otoe-Missouria Corporation Act on August 5, 1988 which governs the formation of businesses within the Tribe's jurisdiction, including wholly-owned and operated Tribal businesses.

12. The Otoe-Missouria Limited Liability Company Act (the "LLC Act") and the Otoe-Missouria Corporation Act ("Corporation Act") establish that wholly-owned corporate entities created under the Act would be instrumentalities and arms of the Tribe and that the officers of such instrumentalities and arms would be deemed officers of the Tribe.

13. The LLC Act established that wholly-owned corporate entities created under its authority would be established for the purpose of carrying out the authorities and responsibilities of the Tribe for economic development of the Tribe and advancement of its citizens.

14. Under this LLC Act, the Tribal Council passed Resolution OMTC#54293, creating Great Plains Lending, LLC on May 4, 2011.

15. Under the Corporation Act, the Tribal Council passed Resolution OMTC #21061, creating American Web Loan, Inc. on February 10, 2010.

16. Pursuant to Tribal law, Great Plains and AWL were created in order to advance the Tribe's economic development and to aid in addressing issues of public health, safety, and welfare.

17. The Tribal Council also exercised its sovereignty by developing, approving, and enacting the Otoe-Missouria Consumer Finance Services Regulatory Ordinance, which governs all consumer finance business activity occurring within the Tribe's jurisdiction and implements the necessary regulation and oversight to ensure legal and lawful business operations. This Ordinance also established, pursuant to sovereign law-making authority and Constitutional powers of the Tribal Council, the Otoe-Missouria Consumer Financial Services Regulatory Commission.

18. The Otoe-Missouria Consumer Finance Services Regulatory Commission (the "Commission") is a regulatory agency formed pursuant to Tribal law and functions as a governmental arm and instrumentality of the Tribe, with its principal place of governmental business located in Red Rock, Oklahoma. The Commission is tasked with regulating all consumer finance business occurring within the Tribe's jurisdiction, including the activities of Great Plains and AWL.

19. Great Plains and AWL are licensed by the Commission pursuant to the requirements of the Consumer Finance Services Regulatory Commission Ordinance (the "Ordinance"). Great Plains' and AWL's licenses are in good standing. Pursuant to the Ordinance, Great Plains and AWL must be compliant with Tribal law to maintain their licenses.

Great Plains and AWL also voluntarily comply with all applicable federal consumer protection laws.

20. As the sole owner and operator of Great Plains and AWL, the Tribe plays a critical role in the lending operations of the companies.

21. The loan application process takes place through a website owned and controlled by the Tribe. The website explicitly informs customers that loans are subject to the exclusive laws and jurisdiction of the Otoe-Missouria Tribe of Indians. Potential consumers fill out an application; the application is reviewed and assessed by the Tribal loan underwriting system. The ultimate authority to decide whether or not to fund a loan lies with the Tribe. Upon approval of a loan application, Great Plains and AWL notify the borrower of the acceptance of his or her loan application, the loan agreement is made available for electronic signature. The loans are funded by Tribally owned bank accounts.

22. Tribal lending has been an invaluable vehicle for economic growth, Tribal services, and Tribal development. The impact of Tribal lending on tribal growth and opportunity has been immeasurable, and its effects have proven critical for tribal advancement and financial assistance.

23. The Tribe's lending enterprises account for close to half of the Tribe's non-federal tribal budget, and has provided critical funding for new Tribal housing and renovations.

28. Tribal lending has created dozens of jobs on Tribal land, including financial support staff, Head Start educators, and Tribal housing personnel.

29. Revenues from Tribal lending have been used towards additional classrooms, books, and teachers for Head Start programs, as well as new after-school and summer programs for Tribal youth. Revenues have also been used to support several Tribal government programs that benefit the general membership, including child care services, employment training, health care and wellness coverage, child protection, and family violence protection.

30. Outside of gaming, tribal lending has been the most significant economic development opportunity that has been available to the Tribe, in terms of both revenue and job

creation.

31. The Tribe's lending initiatives do not just support basic, fundamental needs for Tribal operations and services. They extend the opportunity for the Tribe to move beyond the bottom line of economic footing. Tribal lending gives the Tribe a chance to depart from years of struggling through poverty towards legitimate possibilities for economic prosperity and success.

32. On or around August 13, 2013, Great Plains and AWL received, correspondence from Benjamin M. Lawsky, Superintendent of the New York State Department of Financial Services ("Department"), demanding that it "CEASE AND DESIST [from] offering and originating illegal payday loans in New York." (*See* Cease and Desist letter from Defendant Lawsky, dated August 5, 2013, a true and correct copy of which is attached hereto as Exhibit B.)

32. In its letter, the Department demanded that the Great Plains and AWL confirm in writing within 14 days of the date of its letter that they would "no longer solicit or make illegal payday loans in New York, and outline the steps taken to cease offering these loans to New York consumers. Should your company . . . fail to comply with this directive by August 19, 2013, the Department will take appropriate action to protect New York consumers." (*Id.*)

33. On or around August 5, 2013, I learned that Defendant Lawsky had sent letters to 117 financial institutions stating that Defendant Department was conducting an investigation into "illegal online payday lending," named the Great Plains and AWL as two of 35 lending entities that "solicit and provide illegal payday loans to consumers in New York," and requested that the banks cooperate with the Department to disrupt Great Plains' and AWL's access to the Automated Clearing House ("ACH") network. (*See* Letter from Defendant Lawsky to financial institutions, dated August 5, 2013, a true and correct copy of which is attached hereto as Exhibit C.)

34. On or around August 5, 2013, I learned that Defendant Department sent a similar letter to NACHA, a nonprofit association of financial institutions which administers the ACH network, which was largely similar to the letter it sent to the banks. In this letter, Defendant Department requests that NACHA "choke off ACH access" to the "illegal lenders" identified by

Defendant Department, including the Tribal Corporate Plaintiffs, and asked NACHA to cooperate with the Department to disrupt Great Plains' and AWL's access to the ACH network. (*See* letter from Defendant Lawsky to NACHA, a true and correct copy of which is attached hereto as Exhibit D.)

35. On or around August 5, 2013, I learned that Defendant Department sent a letter titled "Letter to All Debt Collectors Operating in the State of New York," informing them that Defendant Department issued letters to 35 payday loan companies, including Great Plains and AWL, "directing them to cease and desist offering and making usurious payday loans in New York." (*See* letter from Defendant Lawsky to Debt Collectors, dated August 5, 2013, attached hereto as Exhibit E.)

36. Great Plains and AWL operations and its relationships with its banks and third party processors have been greatly harmed by Defendants' attack on legitimate business operations. The Defendant's campaign has already damaged or let to termination of existing relationships with banks, third party payment processors and vendors and the viability of our operation is now at serious risk.

37. By letter dated August 16, 2013, AWL received a letter from its primary bank, Missouri Bank, which processes a portion of AWL's ACH transactions, that Missouri Bank was terminating AWL's continued access to ACH services. (*See* letter from Missouri Bank to AWL, dated August 16, 2013, attached hereto as Exhibit F.) The letter states that Missouri Bank has "become concerned that the regulatory approach may be changing as to any bank's support of the short-term, pay-day, and Internet lending businesses. In particular, a number of federal and state agencies and private regulatory groups, such as NACHA, while declining to give [Missouri Bank] specific guidance, have suggested that Missouri bank faces potential risks and compliance burdens as a result of providing ACH services to you and others employing similar business models."

38. The letter goes on to say that "there have been a number of initiatives by State Attorneys General and other enforcement officials, as well as other regulatory bodies, suggesting

that short-term, pay-day, and Internet lenders must comply with various State licensing, usury and other laws. Some of them have gone so far as to suggest the Bank may be held responsible for transactions by its customers which are found to violate State laws. While [Missouri Bank] understands [its] customers' belief that these State requirements to not apply to their activities, the Bank does not have the resources available to evaluate and determine the adequacy of compliance with the various State laws of each transaction we process for each of our customers." This appears to be a reference to the NACHA letter sent to NACHA Members in response to DFS's letter to NACHA, which threatens NACHA members that processing of transactions not adhering to State law are unauthorized by NACHA rules and necessitate termination of all affected merchant agreements between lenders (sovereign or otherwise) and third party payment processors ("TPPPs") and banks alike.

39. Termination by Missouri Bank creates serious hardship for AWL, and in turn for the Tribe. Missouri Bank serves as AWL's access point to the ACH network, which allows AWL to remain operational. This action by Missouri Bank, triggered by DFS, threatens to put AWL completely out of business. Such economic effects would be devastating to my Tribe and its membership. Such devastation would be far greater than the financial effects on Great Plains or AWL. Ceasing that business activity is tantamount to shutting down the effective continued operation of Tribal government operations, which are largely supported by and dependent upon revenues to provide essential government services.

40. As Chairman of Otoe-Missouria and the Secretary of both Great Plains and AWL, I have firsthand and direct knowledge of the contents of the tribal governmental bank accounts ("Tribal Governmental Accounts") are maintained, including the purposes for which the Tribal Governmental Accounts are used and how they are funded.

41. A significant percentage of the Tribal Governmental Accounts are comprised of funds contributed by Great Plains and AWL that directly enable the Tribe's government to function and provide basic governmental services to the Tribe's citizens.

42. The Tribal Government Accounts provide essential funding for programs,

7

including, but not limited to, tribal administration, housing, law enforcement, fire safety, environmental protection, water/trash, road maintenance, tribal youth and elder programming, prevention of child abuse, tribal employee payroll, general governmental services.

43. The Tribe relies on the revenues generated by Great Plains and AWL in order to administer its government operations and tribal services for members, and the inability to fund tribal operations and programs will create significant hardship for the Tribe and the Tribal government. The Tribe would be unable to continue funding of vital government services currently provided for its citizens from revenues generated by Great Plains and AWL if banks, third party payment processors, or other vendors cease doing business with Great Plains and AWL.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

_____
John Shotton

Executed on August 22, 2013