## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **THE OTOE-MISSOURIA TRIBE OF INDIANS,** a federally-recognized Indian Tribe; **GREAT PLAINS LENDING, LLC,** a wholly-owned tribal limited liability company; **AMERICAN WEB LOAN, INC.,** a wholly-owned tribal corporation, and **OTOE-MISSOURIA CONSUMER FINANCE SERVICES REGULATORY COMMISSION,** a tribal regulatory agency; **LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS,** a federally-recognized Indian Tribe; **RED ROCK TRIBAL LENDING, LLC,** a wholly-owned tribal limited liability company; **LAC VIEUX DESERT TRIBAL FINANCIAL SERVICES REGULATORY AUTHORITY,** a tribal regulatory agency,<br><br>Plaintiffs,<br><br>vs.<br><br>**NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES; BENJAMIN M. LAWSKY, in his official capacity as Superintendent of the New York State Department of Financial Services,**<br><br>Defendants. | **Case No: 13-cv-5930**<br><br>**DECLARATION OF KATHERINE SPILDE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Katherine A. Spilde, hereby declare:

1. I have personal knowledge of the facts stated herein and would be competent to testify as to those facts if called upon to do so in a court of law or administrative proceeding.

2. I serve as Associate Professor of Hospitality and Tourism Management at San Diego State University.

3. I also serve as Endowed Chair of the Sycuan Institute on Tribal Gaming at San Diego State University. In my capacity as Endowed Chair, I am involved in on-going documentation and collaboration with tribal governments across the United States and remain informed and abreast of issues related to the on-going and cumulative effects of tribal economic

development, including tribal government gaming and tribal online lending.

4. I have conducted research on the social and economic impacts of tribal government gaming and economic development since 1994, when I started the Ph.D. program in Anthropology at the University of California in Santa Cruz.

5. My research on tribal government gaming's social and economic impacts includes qualitative and quantitative methods since the impacts of tribal economic development on tribal communities and individuals are complex and encompass financial, health, cultural, spiritual and political dimensions, among others.

6. Ethnographic research I published in the *American Behavioral Scientist* (ABS) in 2006 includes a case study of tribal government gaming's genesis and development on a single reservation in California and highlights the profound changes made possible by a coordinated strategy of nation building and economic development in Indian Country. This research highlights one tribe's particular experience with tribal government gaming and provides insight into the ways federal and state policies actually "play out" at the individual tribal level.

7. Research I co-authored in 2007 with economist Mindy Marks reveals that tribal governments in the poorest counties and tracts started gaming first, since they were the most desperate for additional governmental revenues.

8. Federally recognized tribal governments occupy a unique position within the state and federal landscape. They act as governments--by providing social services, housing and other programs to their citizens—but they are limited in their ability to generate governmental revenues to offer these services.

9. An article I published in *Indian Gaming* magazine in 2012 summarizes academic research into the ways that Federal government economic development policies dating back to the late 19th and early 20th century created a *de facto* transfer economy for tribal governments. Federal government programs created a "projects and grants" mentality among tribes and failed to create or support business development in any meaningful way because it did not address the overriding characteristic of Indian Country: its vast hetereogeneity.

10. Research I was involved in as a Sr. Research Associate at the Harvard Project on American Indian Economic Development found that economic development is more likely to occur and be sustained when tribal governments make their own decisions about what approaches to take in development and what resources to utilize in that development.

11. Research I co-authored and published in 2013 examines the most high profile of tribally-driven self-determination efforts in the late 1970's and early 1980's: the introduction of tribal gaming in a few key states, including Florida, Minnesota and California. This article also explores the economic evidence on the effects of the 1988 Indian Gaming Regulatory Act (IGRA) on American Indians and non-Indians.

12. As Staffer for the Indian Gaming Subcommittee for the National Gambling Impact Study Commission (NGISC), I helped coordinate the testimony of dozens of tribal leaders. After two years of research and testimony the NGISC (1999) found that, "the revenues from Indian gambling have had a significant—and generally positive—impact on a number of reservations."

13. Tribal government economic development across Indian Country has been uneven. The NGISC also found that, "for some, Indian gambling provide substantial new revenue for the tribal government. For others, Indian gambling has provided little or no net revenue to the tribal government but has provided jobs for tribal members."

14. Fifteen years after the NGISC's findings, tribal government gaming growth has plateaued and its uneven distribution across Indian Country has intensified. For example, data from the National Indian Gaming Commission (NIGC), the federal agency that co-regulates tribal gaming with tribal governments, reveals that as recently as 2010, 22 percent (%) of tribal gaming operations earned more than 52 percent (%) of the revenues.

15. My 2013 article in *Tribal Government Gaming: An Annual Report*, provides an overview of research by academic colleagues at Harvard in 2005 that revealed that tribal governments made substantial gains during the 1990's but that large gaps remained between conditions in Indian Country and for the United States. The authors put the remarkable

improvements in Indian Country between 1990 and 2000 into historical perspective by reminding those who might see tribal government gaming as a universal remedy that much remains to be done to close the gap. They concluded at that time that, "If US and on-reservation Indian per capita incomes were to continue to grow at their 1990's rates, it would take half a century for tribes to catch up."

16. Research from the 2006-2010 American Indian Community Surveys indicates that the pace of reservation economic growth slowed between 2000 and 2010. While economic growth on reservations outpaced the United States during the recession, the income gap between reservations and the rest of the United States remains large, with the real per capita income for American Indians on reservations at $10,963 compared to $26,648 for US all races. Economists now speculate that current growth rates on reservations have slowed the pace for closing the gap until at least the year 2080.

17. Fewer than half of the nation's 564 federally-recognized tribal governments are located in a geographic area that supports a land-based tribal gaming facility.

18. Research sponsored through the Sycuan Institute on Tribal Gaming in 2013 finds that American Indian poverty remains at 28% on reservations (compared to 10% for the US) and the unemployment rate on reservations is twice the US average (16% in Indian Country vs. 8% for the US).

19. My own research and that of numerous academic colleagues reveals that tribally-owned and operated gaming has proven to be an enormous success for some tribal governments, but only a small number of tribes can depend upon gaming as its primary or sole source of revenues for "nation building" initiatives.

20. Research I co-authored and published in the *UNLV Gaming Research and Review Journal* in 2013 explores the effects of the Indian Gaming Regulatory Act (IGRA). IGRA requires tribal government ownership of Indian casinos, and the *in situ* expenditure of 100% Indian gaming revenues contrasts starkly with the normal dispersion of casino profits to shareholders around the globe (notwithstanding typically higher-than-average taxes on

4

gambling). Thus, in addition to the usual employment and purchasing consequences, gaming facilities owned by tribal governments bring intensified local government expenditure on social, health, educational, cultural, and environmental programs and on reservation economic diversification.

21.     Tribal governments participating in non-gaming economic development, including those receiving Revenue Sharing Trust Funds (RSTF) in California and those engaged in the online financial services industry through online lending, have similarly used their economic development revenues to invest in tribal nation building activities, including funding critical health care, education and infrastructure improvements.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

*[signature]*

Katherine Spilde

Executed on August 22, 2013