IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **THE OTOE-MISSOURIA TRIBE OF INDIANS,** a federally-recognized Indian Tribe; **GREAT PLAINS LENDING, LLC,** a wholly-owned tribal limited liability company; **AMERICAN WEB LOAN, INC.,** a wholly-owned tribal corporation, and **OTOE-MISSOURIA CONSUMER FINANCE SERVICES REGULATORY COMMISSION,** a tribal regulatory agency; **LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS,** a federally-recognized Indian Tribe; **RED ROCK TRIBAL LENDING, LLC,** a wholly-owned tribal limited liability company; **LAC VIEUX DESERT TRIBAL FINANCIAL SERVICES REGULATORY AUTHORITY,** a tribal regulatory agency, <br><br> Plaintiffs, <br><br> vs. <br><br> **NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES; BENJAMIN M. LAWSKY,** in his official capacity as Superintendent of the New York State Department of Financial Services, <br><br> Defendants. | Case No: 13-cv-5930 <br><br> DECLARATION OF SHERRY TREPPA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

I, Sherry Treppa, hereby declare:

1. I have personal knowledge of the facts stated herein and would be competent to testify as to those facts if called upon to do so in a court of law or administrative proceeding.

2. I am an enrolled member of the Habematolel Pomo of Upper Lake (the "Tribe"), a federally recognized tribe in Lake County, California.

3.     I currently serve as the Chairperson of the Tribe's Executive Council, the primary governing body of the Tribe, and have served in such a capacity since 2008. I have served on the Executive Council since 2004.

4.     I have been involved in Tribal government affairs for a number of years, both with Executive Council, and with various Tribal government departments, including enrollment, and housing.

5.     The Tribe has worked ceaselessly since its restoration to federal recognition to overcome the extreme hardship of the past by organizing and establishing a functioning government, a strong community, and Tribal economic development opportunities to exercise the Tribe's right of self-determination.

6.     Through such efforts, the Tribe helps provides for its membership, particularly its youth, through access to essential healthcare and education services, job opportunities and cultural preservation.

7.     The Tribe descends from four pre-contact tribal groups known as the Xowalek, Danoxa, Yobotui and Kaiyao-Matuku that occupied the area of Upper Lake, California since time immemorial.

8.     The Tribe's history is marred by a series of tragic federal policies. In 1850, the U.S. Cavalry assaulted the population of the Tribe's ancestors, predominantly women and children, in an aggressive military operation known as the "Bloody Island Massacre."

9.     The following year, the United States promised lands to the Tribe's ancestors in a federal treaty that was executed, but never ratified.

10.    In 1856, Pomo people in Lake County were gathered and forced to live on the newly established Nome Cult Indian Farm in Round Valley, northern Mendocino County. This land eventually became the Round Valley Indian Reservation.

11. In 1878, the local Pomo tribal groups of the area banded together and communally purchased 90 acres of land north of Upper Lake, and established a traditional community known as "Habematolel," loosely translated to mean "the people of rock village."

12. In 1907, the federal government set aside the Upper Lake Rancheria for the Indians of Upper Lake on an adjacent parcel, which ultimately grew to 564 acres through a series of piecemeal conveyances.

13. In 1935, the Upper Lake Rancheria adopted and ratified a Constitution pursuant to the Indian Reorganization Act, which it amended in 1941. The United States maintained governmental relations with the Rancheria until Congress passed the California Rancheria Act of 1958 (the "Act") (PL 85-671), which had the disastrous effects of "terminating" the Tribe's recognition, revoking its Constitution and distributing the Rancheria's assets. It had disastrously negative effects on the Tribe and our way of life and truly represents a very dark time in history.

14. In 1975, the Tribe filed an action in the Federal District Court against the United States alleging that the termination of the Upper Lake Rancheria was unlawful.[1] The Tribe prevailed, and in 1983, federal recognition was restored to the Tribe by the Court in <u>Upper Lake Pomo Ass'n v. James Watt</u>.[2]

15. After restoration, the Bureau of Indian Affairs, one of the federal agencies charged with facilitating the trust responsibility the federal government owes to federally-recognized tribes refused to recognize the Tribe's 1941 Constitution, and required the Tribe to reorganize under federal law. Unfortunately, the BIA proceeded to make a series of policy decisions that delayed the Tribe's reorganization process and prevented the Tribe from restoring its lands for years following its successful litigation and restoration to federal recognition.

---

[1] The action originally was filed as <u>Upper Lake Pomo Ass'n v. Cecil Andrus</u>, U.S. District Court, Northern District No. C-75-0181-SW).

[2] U.S. District Court, Northern District No. C-75-0181SW, August 31, 1983. The named defendant in the title of the action was substituted to James Watt when he replaced Cecil Andrus as Secretary of Interior.

16. Despite these challenges, the Tribe reorganized in 1998, and its Constitution was formally approved in a Secretarial Election in 2004.

17. After the Tribe's formal reorganization and restoration to federal recognition, the Tribe undertook action to restore a portion of its original land base. For years following restoration to federal recognition and reorganization, the Tribe was landless and had no property it owned for the benefit of the Tribe (or that was held in trust by the federal government for the benefit of the Tribe).

18. After a long and arduous process, the Tribe identified a parcel of land that was part of the Tribe's aboriginal territory approximately one mile from the boundaries of the Tribe's former Rancheria (existing before the Tribe was terminated pursuant to the Act).

19. Following the federal regulations and the fee-to-trust process, the Tribe applied to have the federal government accept a 60.55 acre parcel of contiguous vineyard land along Highway 20, approximately one mile east of the Highway 20/29 junction in Upper Lake, California into trust for the benefit of the Tribe.

20. After a long federal regulatory process, the Department of the Interior made a final agency determination to acquire approximately 11.24 acres of land into trust for the Tribe on September 8, 2008.

21. The Tribe worked for years to develop a small gaming facility on its trust land. We contracted with a casino developer and took on millions of dollars of debt in the hopes of building, opening, and operating a class III gaming facility in Upper Lake to benefit the Tribe.

22. As required by the Indian Gaming Regulatory Act ("IGRA"), the Tribe endeavored to negotiate a Tribal-State Compact with then-Governor Schwarzenegger. The Tribe was forced to negotiate a high priced compact with the State of California to try to ensure the Tribe's gaming project would be able to open.

23. However, on August 17, 2010, the Assistant Secretary – Indian Affairs, Larry Echo Hawk, rejected the Tribe's Compact with California, and determined that the State's consideration for the Compact related to gaming exclusivity was insufficient to justify the

revenue sharing provisions of the Compact, and thus, that the lack of meaningful concessions made in the Compact were in violation of IGRA. It was a catastrophic economic setback for the Tribe.

24. The Tribe was left in a very terrible position. It had a rejected Compact and no authorization from the federal government to begin its gaming operation. It owed millions of dollars to its casino developer, and had no means to repay the debt. And the Governor was unwilling to negotiate a Compact that would pass muster with the Assistant Secretary – Indian Affairs. Again, the government, under the guise of trying to help the Tribe, had prevented it from exercising self-determination.

25. As soon as Governor Schwarzenegger left office, the Tribe returned to negotiate a new Compact with Governor Brown. The Compact was submitted to the Department of the Interior, and deemed approved on August 31, 2011. For the first time in a long time, the Tribe had a sense of hope for self-sufficiency, with an economic engine that could provide for Tribal government and its membership.

26. The Tribe broke ground on casino construction, and the Running Creek Casino opened Memorial Day Weekend, 2012. Unfortunately, revenues generated by the Casino have been below expectations, and the Tribe was unable to adequately provide for government operations.

27. In 2012, the Tribe was searching for additional economic development opportunities to supplement government budgetary requirements and was introduced to the consumer financial services industry. The Tribe's general membership voted to pursue the business development opportunity, and the Executive Council endeavored to review, approve and enact a regulatory ordinance legalizing and regulating consumer financial services on the Tribe's trust land. After identifying all necessary third party service providers, the Tribe began operating its online consumer financial services business in 2012.

28. The consumer financial service business has proven to be very successful and absolutely vital for funding Tribal government operations. Indeed, fixed costs of the Tribe are

paid exclusively through revenues generated by the Tribe's consumer financial services business, and without the business, the Tribe would be unable to maintain its current financial obligations.

29. The business has also created employment opportunities for Tribal members, which greatly improves the quality of life for our membership.

30. The Tribe was a founding member of the Native American Financial Services Association (and its predecessor the Native American Fair Commerce Coalition) because it understands the vital importance of asserting and protecting tribal sovereignty as it relates to new economic development opportunities. Because tribes are specially situated to engage in businesses they can self-regulate, collaboratively working with like-minded tribal leaders has proven an invaluable benefit to the Tribe's consumer financial service business.

31. Threats to the Tribe's business are very serious, both financially and governmentally. Unlawful action against the business would be financially ruinous because of the beneficial economic impact the consumer financial services business has meant for my Tribe. From a government perspective threats are even more dangerous, because sovereignty is an inalienable right of federally-recognized tribes about which tribal leaders and members must remain constantly vigilant against those who attempt to limit or destroy it. Only by actively asserting the Tribe's right to sovereignty is the Tribe able to protect its right to engage with the federal government on a government-to-government basis and exercise its sovereignty for self-determination and self-sufficiency.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

_____
Sherry Treppa

Executed on August 22, 2013