UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE OTOE-MISSOURIA TRIBE OF INDIANS; GREAT PLAINS LENDING, LLC; AMERICAN WEB LOAN, INC.; OTOE-MISSOURIA CONSUMER FINANCE SERVICES REGULATORY COMMISSION; LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS; RED ROCK TRIBAL LENDING, LLC; LAC VIEUX DESERT TRIBAL FINANCIAL SERVICES REGULATORY AUTHORITY, | No. 13-cv-5930 (RJS)  ECF Case |

                                                              Plaintiffs,

                              – v. –

NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES; BENJAMIN M.
LAWSKY, in his official capacity as
Superintendent of the New York State
Department of Financial Services,

                                                              Defendants.

MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION

ERIC T. SCHNEIDERMAN
*Attorney for Defendants*
Attorney General of the State of New York
120 Broadway, 24th Floor
New York, New York 10271

Garrett Coyle
Linda Fang
Assistant Attorneys General
  *of Counsel*

Dated: September 3, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 3

      A.     The Department's Responsibility to Enforce New York's Usury Laws.................. 3

      B.     The Department's Investigation into Online Payday Lending to New York
            Consumers........................................................................................................... 3

      C.     Other Regulators' Online Payday Lending Investigations ................................. 5

      D.     The Department Takes Action to Enforce New York's Usury Statutes ................ 6

      E.     Third Parties' Actions ......................................................................................... 7

STANDARD OF REVIEW ........................................................................................................... 8

ARGUMENT ................................................................................................................................. 9

I.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE
      THE DEPARTMENT'S ENFORCEMENT OF NEW YORK'S USURY LAWS IS A
      VALID EXERCISE OF THE STATE'S POLICE POWER AND DOES NOT
      INFRINGE PLAINTIFFS' CLAIMED TRIBAL SOVEREIGNTY ............................ 9

      A.     The Department's Enforcement Efforts Relating to Plaintiffs' Online Loans to
            New York Consumers Does Not Interfere with Tribal Self-Governance.......... 9

      B.     Application of New York's Usury Prohibitions to Plaintiffs Is Not Preempted
            by the Indian Commerce Clause, Dodd-Frank, or Any Other Federal Law .... 12

      C.     The Department's Means of Ensuring Plaintiffs' Compliance with New
            York's Usury Statutes Have Been Sanctioned by the Supreme Court ........... 14

      D.     Plaintiffs Lack Standing to Obtain Their Requested Injunctive Relief .......... 15

            1.     Plaintiffs' Claimed Injuries Are the Direct Result of the Actions of
                 Third Parties Not Before the Court and Thus Are Not "Fairly
                 Traceable" to Defendants................................................................... 16

            2.     Enjoining the Department from Enforcing New York Usury Laws Is
                 Not Likely to Redress Plaintiffs' Claimed Injuries Since Third Party
                 Governmental Entities and Private Nongovernmental Entities Remain
                 Free to Regulate Internet Payday Loans and Affiliated Third Parties . 19

II.     PLAINTIFFS' GENERAL CLAIMS OF LOSS OR THREATENED LOSS ARE NOT
        SUFFICIENTLY PARTICULARIZED TO ESTABLISH IRREPARABLE HARM .21

III.    A PRELIMINARY INJUNCTION WOULD NOT SERVE THE PUBLIC INTEREST
        AND IS NOT SUPPORTED BY EQUITABLE CONSIDERATIONS ......................24

CONCLUSION ............................................................................................................................25

# TABLE OF AUTHORITIES

Cases

AFA Dispensing Group B.V. v. Anheuser-Busch, Inc., 740 F. Supp. 2d 465 (S.D.N.Y. 2005) ........................24
Allen v. Wright, 468 U.S. 737 (1984) .............................................................................................................17
Baur v. Veneman, 352 F.3d 625 (2d Cir. 2003) .............................................................................................15
Borey v. National Union Fire Ins. Co., 934 F.2d 30 (2d Cir. 1991) ..............................................................21
Butler v. Obama, 814 F. Supp. 2d 230 (E.D.N.Y. 2011) ..............................................................................20
Cacchillo v. Insmed, Inc., 638 F.3d 401 (2d Cir. 2011) .................................................................................16
Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163 (1989) ......................................................................11
FTC v. Payday Fin., LLC, No. 11-cv-3017, 2013 WL 1309437 (D.S.D. Mar. 28, 2013) ............................11
Heather K. v. City of Mallard, 887 F. Supp. 1249 (N.D. Iowa 1995) ...........................................................22
Hedges v. Obama, ___ F.3d ___, 2013 WL 3717774 (2d Cir. July 17, 2013) ..............................................21
JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75 (2d Cir. 1999) ...............................................................8
Kiowa Tribe v. Mfg. Techs., Inc., 523 U.S. 751 (1998) .................................................................................15
Laird v. Tatum, 408 U.S. 1 (1972) .................................................................................................................21
Linda R.S. v. Richard D., 410 U.S. 614 (1973) .............................................................................................18
Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ...............................................................................15, 16
Manbeck v. Katonah-Lewisboro Sch. Dist., 403 F. Supp. 2d 281 (S.D.N.Y. 2005) .....................................22
Maryland v. King, 569 U.S. ___, 133 S.Ct. 1 (2012) ....................................................................................25
Mashantucket Pequot Tribe v. Town of Ledyard, --- F.3d ---, 2013 WL 3491285 (2d Cir. July 15, 2013)..... 10, 13
Montana v. United States, 450 U.S. 544 (1981)..............................................................................................10
Organized Vill. of Kake v. Egan, 369 U.S. 60 (1962) .................................................................................9, 10
Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316 (2008) ........................................11
Pope v. County of Albany, 687 F.3d 565 (2d Cir. 2012) ..................................................................................8
Port Wash. Teachers' Ass'n v. Bd. of Educ., 478 F.3d 494 (2d Cir. 2007) ...................................................21
Puyallup Tribe, Inc. v. Dep't of Game, 433 U.S. 165 (1977) .........................................................................13
Rodriguez v. DeBuono, 175 F.3d 227 (2d Cir. 1999) ....................................................................................21
Seneca Nation of Indians v. Paterson, No. 10-cv-687A, 2010 WL 4027795 (W.D.N.Y. Oct. 14, 2010) ......24
Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976) ..................................................................16, 18, 19
Sprint Commc'ns Co., L.P. v. APCC Servs., 554 U.S. 269 (2008) .................................................................19
Town of Babylon v. Fed. Hous. Fin. Agency, 699 F.3d 221 (2d Cir. 2012) ...................................................20
Ward v. New York, 291 F. Supp. 2d 188 (W.D.N.Y. 2003) ............................................................................12
Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134 (1980) ................ 11, 12, 13, 14
Water Wheel Camp Recreational Area, Inc. v. Larance, 642 F.3d 802 (9th Cir. 2011)................................11
White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980) .....................................................................9
Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7 (2008) ............................................................................23


Statutes

12 U.S.C. § 5481(27) .......................................................................................................................................13
N.Y. Banking Law § 14-a ..................................................................................................................................3
N.Y. Gen. Oblig. Law § 5-501 ..........................................................................................................................3
N.Y. Penal Law §§ 190.40–42 ..........................................................................................................................3


Constitutional Provisions

U.S. CONST. ART. I, § 8, CL. 3 .........................................................................................................................12

Defendants the New York State Department of Financial Services (the "Department"), and Benjamin M. Lawsky, as Superintendent of the Department, respectfully submit this memorandum of law in opposition to plaintiffs' motion for a preliminary injunction.[1]

## PRELIMINARY STATEMENT

Plaintiffs in this action — three Native American tribal lending companies and their respective tribes and tribal agencies — seek to enjoin New York's top financial regulator from enforcing New York's validly enacted usury statutes to protect New York consumers from falling victim to usurious lending practices.  The Department's investigation into the payday lending industry earlier this year revealed that, at present, out-of-state payday lenders like plaintiffs solicit and offer loans at interest rates of upwards of 888% per annum, over fifty times the usury caps set by New York law, directly to New York residents over the Internet.  The Department seeks to stop these illegal and harmful payday loans from flowing into New York and has made efforts to do so by: (1) sending cease-and-desist letters to plaintiffs and other online payday lenders demanding that they stop making usurious loans to New York consumers in New York; and (2) sending letters to third-party banks and a private self-regulatory association requesting that they stop facilitating the flow of unlawful Internet-based payday loans into New York.  Plaintiffs now ask this Court to enjoin those efforts, effectively silencing the Department and preventing it from communicating with these third parties, on the theory that the Department's letters somehow interfere with plaintiffs' claimed tribal sovereignty.

Contrary to plaintiffs' assertions, the Department is empowered to protect vulnerable New York consumers from the serious economic harms caused by plaintiffs' online lending

---

[1]  Defendants also respectfully submit the accompanying Declaration of Debra C. Brookes, dated September 3, 2013 ("Brookes Decl."), and Declaration of Max J. Dubin, dated September 3, 2013 ("Dubin Decl."), along with the exhibits annexed thereto, in opposition to plaintiffs' motion.

practices.  State laws like New York's usury statutes may validly be applied to economic transactions between Native Americans and New York consumers when those transactions have significant and injurious off-reservation effects — as is the case here, given the crippling debt that payday loans cause to New Yorkers.  Moreover, the means that the Department has chosen to enforce New York's usury laws similarly are valid.  The Supreme Court has explained that States may directly regulate third-party facilitators to ensure Native Americans' compliance with state law.  Thus, plaintiffs are not likely to succeed on the merits.  <u>See</u> Section I.A–C, *infra*.

Plaintiffs also cannot show a reasonable likelihood of success on the merits because they lack Article III standing.  <u>See</u> Section I.D, *infra*.  The supposed threat to the continued viability of plaintiffs' online payday lending businesses is not "fairly traceable" to the Department's efforts to ensure their compliance with New York law — namely, the letters requesting the voluntary cooperation of the third-party banks and private self-regulatory association — but rather to the independent decisions of those third parties.  <u>See</u> Section I.D.1, *infra*.  In addition, plaintiffs' requested injunction would not likely redress their claimed injuries since other federal and state governmental entities remain free to regulate them — and indeed are actively seeking to do so.  <u>See</u> Section I.D.2, *infra*.

Moreover, plaintiffs are not entitled to a preliminary injunction because they have failed to set forth sufficiently particularized and concrete harms resulting from defendants' actions and therefore cannot demonstrate the requisite irreparable injury.  Plaintiffs have identified only a *single bank* which has indicated that it intends to terminate its relationship with a *single plaintiff*, and contrary to the statements in their brief, plaintiffs have not provided evidence that *any* third-party payment processors have actually sought to terminate their business with plaintiffs.  <u>See</u> Section II, *infra*.

Finally, the balance of the equities and the public interest militate against granting a preliminary injunction here.  Plaintiffs' requested injunction would deprive New York consumers of the benefit of the duly enacted usury laws aimed at protecting them from the serious economic harm caused by exploitative lending, and in return, the injunction would confer no corresponding benefit on plaintiffs because other regulators would remain free to continue their regulatory efforts against the online payday loan industry.  <u>See</u> Section III, *infra*.

Accordingly, plaintiffs' motion should be denied in its entirety.

## FACTUAL BACKGROUND

A.   **The Department's Responsibility to Enforce New York's Usury Laws**

The Department is responsible for regulating and supervising the provision of financial products and services in the State.  Brookes Decl. ¶ 4.  Included among the Department's myriad responsibilities is the duty to investigate and prosecute consumer complaints of financial fraud, to protect and assist users of financial products and services in the State, to ensure the enforcement of provisions of the State's insurance, banking and financial services laws, and to regulate and supervise the many state chartered banks which do business in New York.  <u>Id.</u>

Like many other States, New York has long-since enacted laws limiting the maximum interest rates on certain small denomination loans.  Under those laws, making a loan below $250,000 with an annual interest rate above 16% constitutes civil usury.  *See* N.Y. GEN. OBLIG. LAW § 5-501; N.Y. BANKING LAW § 14-a.  Charging an annual interest rate above 25% is a criminal violation.  *See* N.Y. PENAL LAW §§ 190.40–42.

B.   **The Department's Investigation into Online Payday Lending to New York Consumers**

In early 2013, the Department, in response to a number of consumer complaints, commenced an investigation into certain usurious loans that were and are being offered and

issued to New York residents over the Internet.  Brookes Decl. ¶ 5.  These loans are frequently

referred to as "payday" loans because they are often advertised as a short-term advance on a

future paycheck or other anticipated income.  Id. ¶ 3.

Through its investigation, the Department learned that these loans were being offered

over the Internet to New York residents, whereby the prospective borrower fills out an online

application on the lender's website, or calls the lender directly to apply over the phone.  Dubin

Decl. ¶¶ 6-7.  In the typical online payday loan scenario, a New York consumer obtains a lump-

sum from the lender, which is electronically credited to the consumer's bank account in New

York.  Id. ¶ 8.  In exchange, the consumer authorizes the lender to regularly debit his bank

account going forward for certain, fixed amounts, corresponding to the consumer's anticipated

payday schedule.  Id. ¶ 7.  The consumer is led to believe that these debits would go towards

repayment of the loan and the accompanying finance charges, and thus would extinguish the

debt; in actuality, however, what the lender obtains is an open-ended authorization to debit the

borrower's account, which is generally applied only to the interest portions of the loan

obligations, without any reduction in principal for several months.  Id. ¶ 3.  The result of this

practice is that consumers would continue to incur exorbitant interest obligations on their loans,

turning these purportedly short-term loans into long-term obligations and thereby trapping the

borrowers in a cycle of debt.  Id.

To learn more about the mechanics of how these loans worked, in March 2013 the

Department sent informal surveys to approximately 20 New York state-chartered and national

banks, and followed up with interviews and meetings with these financial institutions.  Id. ¶¶ 4-5.

Through these efforts, the Department learned that the payday lender generally initiates the

electronic transfer of funds through its bank (the "Originating Depository Financial Institution"

4

or "ODFI"), or through third-party payment processors, who then facilitate the transfer through the ODFI.  Id. ¶¶ 8-10.  The ODFI then sends the funds to the borrower's bank (the "Receiving Depository Financial Institution" or "RDFI") by issuing a credit over the Automated Clearing House ("ACH") network.  Id. ¶ 10.  Currently, because transactions processed through the ACH network only include limited information about the underlying transactions, the Department learned that the RDFIs are generally unable to identify whether an ACH transaction involves a usurious loan that is unlawful in the borrower's state, and must accept all ACH transfers as presumptively valid unless disputed by the customer.  Id. ¶ 12.  Under the current system, the onus on ensuring that such electronic fund transfers are legitimate falls on the ODFIs and payment processors who facilitate the transactions for the lenders.  Id. ¶ 13.  The facilitation of financial transactions that are void under relevant state law violates the rules of NACHA — the Electronic Payments Association ("NACHA"), a private self-regulatory group responsible for regulating the national ACH network.  Id.

## C.    Other Regulators' Online Payday Lending Investigations

Online payday loans like those offered by plaintiffs are illegal in 15 States and the District of Columbia.  Brookes Decl. ¶ 27.  In the last few years, a number of other states have begun aggressively pursuing enforcement actions against online payday lenders.  Id. ¶¶ 28-32.  Federal regulators have also been active in this field.  As recently as March 2013, the United States Department of Justice's Financial Fraud Enforcement Task Force stated that federal regulators "ha[ve] prioritized the role of financial institutions in mass marketing fraud schemes — including deceptive payday loans" and "also [are] investigating the businesses that process payments on behalf of the fraudulent merchants — financial intermediaries referred to as third-party payment processors."  Id. ¶ 19.  Other federal regulatory organizations, such as the Federal Depository Insurance Corporation, have warned banks and other financial companies

about the "legal, reputational, and compliance risks" associated with being involved in

facilitating questionable financial transactions.  Federal Deposit Insurance Corporation's Revised

Guidance to Financial Institutions on Payment Processor Relationships, dated Jan. 31, 2012 ,

available at http://www.fdic.gov/news/news/financial/2012/fil12003.html (last visited Aug. 28,

2013) (warning banks to closely examine their relationships with third party payment

processors).

**D.     The Department Takes Action to Enforce New York's Usury Statutes**

Based on the results of its investigation, in August 2013, the Department focused its

attention on 35 online payday lenders who the Department had reason to believe, based on the

results of its investigation, were making loans to New York consumers at usurious interest rates.

Brookes Decl. ¶ 8.  These 35 lenders included 16 domestic companies, 8 foreign entities, and

another 11 that purport to be affiliated with or owned by federally-recognized Indian tribes.  Id.

¶ 9.

On August 5, 2013, the Department sent letters to each of these 35 online payday lenders.

The letter stated to the recipients: "[b]ased on an investigation by [the Department], it appears

that [you] and/or [your] subsidiaries, affiliates or agents are using the Internet to offer and

originate illegal payday and/or usurious loans to New York consumers."  Id. ¶ 10 & Exs. 1-3.

The letter recited New York's usury prohibitions, "directed" the recipients "to CEASE &

DESIST offering and originating illegal loans in New York," and "to confirm in writing to the

Department that [the recipients] and its subsidiaries, affiliates or agents no longer solicit or make

usurious loans in New York, and outline the steps taken to cease offering these loans to New

York consumers."  Id.  Finally, the letters stated that should the recipients fail to comply with the

cease and desist directive by August 19, 2013, "the Department will take appropriate action to

protect New York consumers."  Id.

On the same day, the Department sent letters to 117 state and nationally chartered banks, and to NACHA.  Id. ¶ 13 & Exs. 4-5.  These letters describe the present difficulties in detecting potentially unlawful and usurious loans, and requested the recipients' assistance in helping to "stop illegal payday loans from entering into New York through the ACH network."  Id.  The letters did not threaten enforcement action against any of the banks or NACHA.  Id.

**E.      Third Parties' Actions**

Subsequently, NACHA sent a letter to its member ODFIs referencing the Department's letter and reiterated NACHA rules which require members to conduct adequate due diligence on the underlying transactions that they process to ensure compliance with all applicable state laws. Brandon Decl. ¶ 46, ECF No. 12; Brookes Decl. Ex. 6.  The NACHA letter suggested that facilitation of financial transactions that may be void under relevant state law would violate NACHA rules.  Brookes Decl. Ex. 6.  The NACHA letter asked its members to immediately evaluate their ACH activities with payday lenders and to advise NACHA whether they will stop originating transactions for payday lenders.  Brandon Decl. ¶ 46; Brookes Decl. Ex. 6.

According to plaintiffs, on August 6, 2013, InterceptEFT, a third-party payment processor used by plaintiffs, notified certain Native American Financial Services Association ("NAFSA") member tribes of InterceptEFT's intent to stop the provision of payment processing services for such tribes.  InterceptEFT Letter (Brandon Decl. Ex. D, ECF No. 12-4). Furthermore, plaintiffs claim that on August 16, 2013, Missouri Bank, the ODFI for American Web Loan Inc. ("AWL"), one of the three plaintiff lending companies, sent a letter to AWL notifying it that the bank will no longer provide ACH services for AWL's online payday lending. Missouri Bank Letter (Shotton Decl. Ex. F, ECF No. 10-6).  The letter stated:

> In the last nine months . . . we have become concerned that the
> regulatory approach may be changing as to any bank's support of
> short-term, pay-day, and Internet lending businesses.  In particular,

> a number of federal and state agencies and private regulatory
> groups, such as NACHA, while declining to give us specific
> guidance, have suggested that Missouri Bank faces potential risks
> and compliance burdens as a result of providing ACH services to
> [American Web Loan] and other employing similar business
> models. . . . Most recently, there have been a number of initiatives
> by State Attorneys General and other enforcement officials, as well
> as other regulatory bodies, suggesting that short-term, pay-day, and
> Internet lenders must comply with various State licensing, usury,
> and other laws.  Some of them have gone so far as to suggest the
> Bank may be held responsible for transactions by its customers
> which are found to violate State laws.  While we understand our
> customers' belief that these State requirements do not apply to
> their activities, the Bank does not have the resources to evaluate
> and determine the adequacy of compliance with the various State
> laws of each transaction we process for each of our customers.
> Furthermore, the Bank cannot put its safety and soundness in
> question by assuming the risk that one of more of these State
> enforcement actions may be successful, resulting in a potential
> adverse impact on the Bank.  For these reasons, the Bank has
> determined that, in 60 days, the Bank will cease providing ACH
> services in connections with short-term, pay-day, and Internet
> lending.

Id.  This lawsuit followed.

## **STANDARD OF REVIEW**

Injunctive relief is "an extraordinary remedy that should not be granted as a routine

matter."  JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 80 (2d Cir. 1999).  A motion for "a

preliminary injunction against government action taken in the public interest pursuant to a

statutory scheme" will be denied unless the movant can show: (1) he will suffer irreparable harm

without the injunction; (2) a likelihood of success on the merits of the underlying claim; (3) an

injunction would be in the public interest; and (4) the balance of equities weighs in favor of

granting the injunction.  Pope v. County of Albany, 687 F.3d 565, 570 & n.3 (2d Cir. 2012).

# ARGUMENT

I.   **PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THE DEPARTMENT'S ENFORCEMENT OF NEW YORK'S USURY LAWS IS A VALID EXERCISE OF THE STATE'S POLICE POWER AND DOES NOT INFRINGE PLAINTIFFS' CLAIMED TRIBAL SOVEREIGNTY**

### A.   The Department's Enforcement Efforts Relating to Plaintiffs' Online Loans to New York Consumers Does Not Interfere with Tribal Self-Governance

As a general rule, nondiscriminatory state laws may validly be applied to Native Americans' *off-reservation* conduct, so long as there is no *express* federal law preempting such state laws. See Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 511 (1991) ("[A]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State.") (citation omitted).  And state laws may validly be applied to commercial transactions between the State's own citizens and Native Americans, even where the transactions occur *on tribal land*, unless application would infringe on tribal sovereignty or has been preempted by federal law.  Rice v. Rehner, 463 U.S. 713, 718 (1983) ("'[Even] on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law.'") (citations omitted); accord Organized Vill. of Kake v. Egan, 369 U.S. 60, 75 (1962).

Plaintiffs contend that New York's usury statutes cannot apply to them because the loans at issue involve only on-reservation conduct by Indian tribes.  See, e.g., White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 151 (1980) ("When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.").  But that argument does not apply here because as a factual matter, substantial parts of plaintiffs' online loans to New York residents occur off tribal lands and involve non-Native Americans.

9

See Colorado v. Cash Advance, 205 P.3d 389, 400–01 (Colo. App. 2008) (holding that state usury laws applied to Native American's online payday loans to state residents because such loans constituted off-reservation activity).  In particular: (1) New York residents typically apply for online payday loans by accessing the lenders' websites via computers in New York; (2) New York residents agree to the lending agreements in New York; (3) the loans are deposited into and ultimately repaid out of the consumers' bank accounts located in New York; and (4) the banks and payment processors that facilitate the loans by executing the monetary transfers are not tribally affiliated and are generally located off-reservation.[2]  See Dubin Decl. ¶¶ 6-11.  Under these circumstances, New York's usury statutes apply to plaintiffs' online lending practices at issue here unless the statutes interfere with tribal self-governance or are preempted by federal law.  See Rice, 463 U.S. at 718; Kake, 369 U.S. at 75; Mashantucket Pequot Tribe v. Town of Ledyard, --- F.3d ---, 2013 WL 3491285, at *8 (2d Cir. July 15, 2013).  New York's usury prohibitions do neither.

Plaintiffs argue that New York interferes with their right of tribal self-governance by regulating their online lending to New York consumers because *tribes* have the authority to regulate those transactions.  See Pls.' Br. at 13–14, 16–17, 19–20 (ECF No. 8).  But that argument is a non sequitur.  Tribal regulatory authority and state regulatory authority are not mutually exclusive; concurrent regulatory authority is commonplace and unremarkable.[3]  See,

---

[2]  The fact that plaintiffs' loan agreements may have choice-of-law clauses stating that they are governed exclusively by tribal law is not relevant.  Private parties cannot bargain away a State's regulatory authority.  See Colville, 447 U.S. at 156 ("[P]urchasers entering the reservation are not the State's agents and any agreements which they might make cannot bind it.").

[3]  Thus, the cases cited by the plaintiffs about the reach of *tribal* law fail to show a likelihood of success on their claims challenging the reach of *state* law.  See Montana v. United States, 450 U.S. 544 (1981); Plains Commerce Bank v. Long Family Land & Cattle Co., 554

e.g., Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 154–59

(1980) (holding that Indian tribe did not oust State of power to impose cigarette tax on on-

reservation sales to non-Native American customers by imposing its own tax on same

transaction); Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 189 (1989) ("The federal

sovereign has the undoubted power to prohibit taxation of the Tribe's lessees by the Tribe, by the

State, or by both, but since it has not exercised that power, concurrent taxing jurisdiction over all

of Cotton's on-reservation leases exists.").

Indeed, plaintiffs' theory, if accepted, would have drastic and far-reaching implications

for state sovereignty.  As the Supreme Court has explained:

> The Tribes assert the power to create such exemptions [from state
> taxation] by imposing their own taxes or otherwise earning
> revenues by participating in the reservation enterprises.  *If this
> assertion were accepted, the Tribes could impose a nominal tax
> and open chains of discount stores at reservation borders, selling
> goods of all descriptions at deep discounts and drawing custom
> from surrounding areas.*  We do not believe that principles of
> federal Indian law, whether stated in terms of pre-emption, tribal
> self-government, or otherwise, authorize Indian tribes thus to
> market an exemption from state taxation to persons who would
> normally do their business elsewhere.

Colville, 447 U.S. at 155 (emphasis added).

Rejecting plaintiffs' novel theory reveals that applying New York's usury statutes to their

---

U.S. 316 (2008); Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc., 715 F.3d 1196 (9th
Cir. 2013); Water Wheel Camp Recreational Area, Inc. v. Larance, 642 F.3d 802 (9th Cir. 2011);
Fox Drywall & Plastering, Inc. v. Sioux Falls Constr. Co., No. 12-cv-4026, 2012 WL 1457183
(D.S.D. Apr. 26, 2012); FTC v. Payday Fin., LLC, No. 11-cv-3017, 2013 WL 1309437 (D.S.D.
Mar. 28, 2013).

Likewise, the Interstate Commerce Clause cases cited by the plaintiffs, see Pls.' Br. at 18-
19, explaining the limits of one State's regulatory jurisdiction in another State are inapposite
here.  See Cotton Petroleum, 490 U.S. at 192 ("[T]he fact that States and tribes have concurrent
jurisdiction over the same territory makes it inappropriate to apply Commerce Clause doctrine
developed in the context of commerce 'among' States with mutually exclusive territorial
jurisdiction to trade 'with' Indian tribes.").

online loans to New York consumers does not impermissibly infringe their claimed right of tribal self-governance — that is, their right to "'make their own laws and be ruled by them.'" Colville, 447 U.S. at 156 (citation omitted).  New York's regulation of plaintiffs' online loans to New York consumers does not; the tribes can (and allegedly do) make laws regulating tribal lenders and their lending practices.  See Shotton Decl. ¶¶ 18–19; Williams Decl. ¶¶ 16–18.

**B.    Application of New York's Usury Prohibitions to Plaintiffs Is Not Preempted by the Indian Commerce Clause, Dodd-Frank, or Any Other Federal Law**

Plaintiffs next argue that New York's usury laws are preempted by federal law, but fail to identify any express congressional statement preempting state law in the field of consumer lending.  As an initial matter, the Indian Commerce Clause, which grants Congress authority "[t]o regulate Commerce . . . with the Indian tribes," U.S. CONST. ART. I, § 8, CL. 3, does not preempt nondiscriminatory state laws — like New York's usury statutes — that affect commerce with Indian tribes.  See, e.g., Colville, 447 U.S. at 157 ("It can no longer be seriously argued that the Indian Commerce Clause, of its own force, automatically bars all state taxation of matters significantly touching the political and economic interest of the Tribes.").  Nor can the Dodd-Frank Wall Street Reform and Consumer Protection Act reasonably be read to preempt state law here.  Indeed, plaintiffs concede, as they must, that the Act "did *not* displace state regulations over consumer lending in favor of federal law leaving federal and state governments to act as co-regulators in the consumer lending."  Pls.' Br. at 15 (emphasis added).

Nor is there any well-established federal policy of supporting exclusive tribal control over consumer lending.  See Ward v. New York, 291 F. Supp. 2d 188, 204 (W.D.N.Y. 2003) (holding that state law banning shipment of cigarettes directly to New York consumers could be validly applied to Native American businesses selling cigarettes to New York consumers via phone, mail order, and Internet because there was no "federal policy favoring or promoting tribal

control over the sale of cigarettes").  To the contrary, the provisions of Dodd-Frank cited by plaintiffs reveal a federal policy of allowing *concurrent state and tribal* regulation of consumer lending.  See 12 U.S.C. § 5481(27); see also Colville, 447 U.S. at 156 ("[W]e do not infer from the mere fact of federal approval of [Indian laws regulating a particular field], or from the fact that the Tribes exercise congressionally sanctioned powers of self-government, that Congress has delegated the far-reaching authority to pre-empt [State laws in that field].").

Moreover, New York's regulatory interest here is acute because the harmful effects of usurious loans are felt in New York — further indicating that Congress could not have intended to preempt New York's usury laws here.  See Rice, 463 U.S. at 724 ("'[A] State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate State intervention.'") (citation omitted); Puyallup Tribe, Inc. v. Dep't of Game, 433 U.S. 165, 175–77 (1977) (holding that federal treaty with tribe giving tribe the right to fish "at all usual and accustomed" places in creek did not preempt reasonable state regulation of Indians' on-reservation fishing in creek because of State's interest in conserving natural resources). Insulating online loans by Native Americans to New York consumers from New York's usury statutes would open a gaping loophole in New York's consumer lending regulatory scheme and hamstring New York's ability to protect its consumers against those pernicious effects.  See Mashantucket, 2013 WL 3491285, at *15 ("[S]tates have a valid interest in ensuring compliance with lawful taxes that might easily be evaded.") (citation and quotation marks omitted).

Finally, the tribal interests in avoiding New York's usury statutes are not significant. Plaintiffs say that New York's usury laws hurt their online lending to New York consumers, and by extension the social and economic services for which their tribes use the revenues, but those transactions exists only because of their claimed exemption from New York law — an interest

13

the Supreme Court has refused to recognize when analyzing the tribal interests at stake.  See Colville, 447 U.S. at 151 & n.27, 157 ("[A]lthough the result of these [state] taxes will be to lessen or eliminate tribal commerce with nonmembers, that market existed in the first place only because of a claimed exemption from these very taxes.  The taxes under consideration do not burden commerce that would exist on the reservations without respect to the tax exemption.").  In addition, New York's usury laws do not prohibit plaintiffs' lending activities in jurisdictions that permit them.  Nor do those statutes restrict online lending to New York consumers at interest rates below 16%.  And New York's usury laws do not displace the tribes' authority to regulate Native Americans' lending transactions; plaintiffs may easily comply with both the governing tribal regulations and New York's usury statutes.  See id. at 158 (upholding validity of state taxation requirement where "[t]here is no direct conflict between the state and tribal schemes, since each government is free to impose its taxes without ousting the other").

    In sum, in light of the absence of an express congressional intent to give tribes the exclusive authority to regulate Native Americans' online lending to non-Native Americans, New York's strong interest in protecting its consumers from the harmful effects of payday loans, and the weak tribal interests in being exempt from New York's usury laws, New York's usury laws are not preempted by federal law.[4]

### C.    The Department's Means of Ensuring Plaintiffs' Compliance with New York's Usury Statutes Have Been Sanctioned by the Supreme Court

    There is nothing impermissible about the means by which the Department is enforcing New York's usury statutes.  First, the doctrines of tribal sovereignty and tribal sovereign

---

    [4]  To the extent plaintiffs argue that New York's usury statutes cannot apply to them because of some freestanding notion of "tribal sovereignty" independent of tribal sovereign immunity from suit, tribal self-governance, and federal preemption, the Second Circuit has rejected that argument.  See Mashantucket, 2013 WL 3491285, at *17 ("The Tribe alleges that, independent of all else, tribal sovereignty poses another hurdle to the imposition of the tax. . . . Tribal sovereignty . . . is insufficient in itself to bar the State's generally applicable [laws.]").

immunity do not preclude the Department from (as it did here) sending cease-and-desist letters seeking plaintiffs' voluntary compliance with New York law.  See Potawatomi, 498 U.S. at 512, 514 (requests for compliance with state law do not violate tribal sovereign immunity); see also Kiowa Tribe v. Mfg. Techs., Inc., 523 U.S. 751, 755 (1998) ("There is a difference between the right to demand compliance with state laws and the means available to enforce them.").

Second, to the extent plaintiffs contend that the Department may not act against third parties who facilitate plaintiffs' usurious lending to New Yorkers, they are wrong.  The Supreme Court has explained that even where the doctrine of tribal sovereign immunity bars a State from bringing an enforcement action directly against a tribe or tribal entity, the State may still use other ways to ensure their compliance with state law — including enforcement actions against third party facilitators.  See Potawatomi, 498 U.S. at 514 ("States may of course collect the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation, or by assessing wholesalers who supplied unstamped cigarettes to the tribal stores.") (citations omitted).  By merely seeking the voluntary assistance of transactional intermediaries, the Department has done far less.

### D.   Plaintiffs Lack Standing to Obtain Their Requested Injunctive Relief

Plaintiffs also cannot demonstrate a reasonable likelihood of success on the merits of their claims because they lack Article III standing to proceed against defendants.  To have a justiciable "case or controversy," a plaintiff must satisfy the three "irreducible constitutional minimum[s]" of standing: (1) injury-in-fact; (2) causal connection between the complained-of conduct and the alleged injury; and (3) redressability.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  "[A] plaintiff must demonstrate standing for each claim and form of relief sought."  Baur v. Veneman, 352 F.3d 625, 642 n.15 (2d Cir. 2003).  In the context of a preliminary injunction motion, a plaintiff cannot rely merely on conclusory allegations, but

"must set forth by affidavit or other evidence specific facts" sufficient to demonstrate standing. Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011) (quoting Lujan, 504 U.S. at 561) (quotation marks omitted).

> 1.  Plaintiffs' Claimed Injuries Are the Direct Result of the Actions of Third Parties Not Before the Court and Thus Are Not "Fairly Traceable" to Defendants

Plaintiffs cannot establish that their two alleged injuries — being forced out of business due to the supposed termination of preexisting commercial relationships with banks and payment processors (thus eliminating a source of funding for the tribes' social and economic programs), and the infringement to their tribal sovereignty allegedly resulting thereby — are "fairly traceable" to defendants' actions.  With respect to causation, the Supreme Court has held a plaintiff must demonstrate that his claimed injury is "fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party."  Lujan, 504 U.S. at 561 (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41–42 (1976)).  Where, as here, a plaintiff's claimed injury "arises from the government's allegedly unlawful regulation . . . of *someone else* . . . causation and redressability ordinarily hinge on the response of the regulated [] third party . . . standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  Lujan, 504 U.S at 561–62 (emphasis in original) (citations omitted).

Plaintiffs claim that since the time of defendants' letters in early August 2013, payment processors and originating banks have terminated pre-existing business relationships, or otherwise have sought to impose increased fees and due diligence requirements on plaintiffs, all of which has purportedly threatened the viability of plaintiffs' business and tribal operations. Compl. ¶¶ 43–44 (ECF No. 1).  Plaintiffs also cite the letter by NACHA to its member banks, which referenced defendants' letters.  Brandon Decl. ¶ 46 (ECF No. 12).  Plaintiffs argue that the decisions by banks and payment processors to terminate their relationships with plaintiffs were

directly triggered by defendants' actions.  But plaintiffs provide no factual support for this contention.

As an initial matter, defendants did not contact any payment processors in connection with the Department's Internet payday loan investigation, Brookes Decl. ¶ 14, nor do plaintiffs so allege.  Thus, as to the payment processors, there is absolutely no factual basis upon which the Court can conclude that the independent business decisions by these third parties to terminate their relationships with plaintiffs, or to seek price increases or other contract modifications, were causally connected to defendants' actions.

Furthermore, while it is true that defendants did write to banks and to NACHA to advise them that defendants had reason to believe, based on the Department's investigation, that certain payday lenders, including plaintiffs' loan companies, were offering and originating loans in New York in violation of New York law, the letters did not threaten any enforcement action against the banks or NACHA.  Rather, the letters merely notified the recipients of New York's usury prohibitions and sought their assistance in helping to "stop illegal payday loans from entering into New York through the ACH network."  Bank Letter at 3 (Brookes Decl. Ex. 4) ("[The Department] [] requests that you inform us of the steps that you are taking, in your capacity as either an ODFI, RDFI or both, as applicable, to stop illegal payday loans from entering into New York through the ACH network."); Letter to NACHA at 3 (Brookes Decl. Ex. 5) ("We are requesting that you work with us to choke off ACH access to the 35 illegal lenders DFS's investigation as identified to date, as well as the broader illegal payday lending industry.").  In any event, insofar as plaintiffs are seeking to assert the rights of certain third party banks to be free from enforcement efforts by defendants, they plainly do not have standing to do so.  See, e.g., Allen v. Wright, 468 U.S. 737, 751 (1984) (prudential standing limitations include "the

general prohibition on a litigant's raising another person's legal rights").

In this case, it was not the Department's actions, but rather the independent decisions and actions of the third parties not before the Court — that is, NACHA's decision to write to its members to remind them of NACHA rules, and the banks who alleged opted to exit the business of dealing with payday lenders — that caused the alleged injuries claimed by plaintiffs.  Thus, plaintiffs cannot establish standing.  See Simon, 426 U.S. at 42–43 (no standing where it was "purely speculative" whether the alleged denials of service to indigent patients was fairly attributable to petitioners' adoption of a new tax policy or resulted from the independent decisions of hospitals made irrespective of their tax implications).

Additionally, defendants' recent actions in seeking to curtail usurious online lending cannot be viewed in a vacuum.  Here, the chain of causation between defendants' actions and plaintiffs' purported injury is particularly tenuous when viewed against the backdrop that numerous other state and federal authorities have been and continue to be engaged in similar regulatory efforts.  On this point, the Missouri Bank letter to American Web Loan in fact undercuts plaintiffs' theory of causation; specifically, the letter cited as the reason of the bank's decision for termination — *not any actions by the Department specifically* — but increased regulatory scrutiny of payday lending by "a number of federal and state agencies and private regulatory groups."  Missouri Bank Letter (Shotton Decl. Ex. F, ECF No. 10-6).

In light of the intervening independent decisions by various third parties not before the Court — including other regulatory agencies, banks, NACHA, and payment processors — that stand between defendants and plaintiffs, plaintiffs cannot make the requisite showing that their injuries are "fairly traceable" to defendants' actions.  See Linda R.S. v. Richard D., 410 U.S. 614, 618–19 (1973) (no standing where plaintiff's inability to obtain child support payments

from the noncustodial parent could not be fairly attributed to prosecutor's alleged failure to enforce child support delinquency statutes as there was no "direct relationship" between the injury and defendant's inaction); <u>Simon</u>, 426 U.S. at 42–43 (no standing where the causal connection between plaintiffs injuries and the challenged tax ruling was "wholly speculative"). Accordingly, plaintiffs lack standing.

> 2. <u>Enjoining the Department from Enforcing New York Usury Laws Is Not Likely to Redress Plaintiffs' Claimed Injuries Since Third Party Governmental Entities and Private Nongovernmental Entities Remain Free to Regulate Internet Payday Loans and Affiliated Third Parties</u>

Nor can plaintiffs satisfy the redressability requirement because their alleged injuries are not likely to be redressed by their requested injunction prohibiting the Department from interfering with plaintiffs' business, including from pursuing or threatening to pursue enforcement actions against banks, payment processors and "financial services associations with which [plaintiffs] have . . . business relationships . . . . " Compl. ¶ 59; <u>see</u> <u>Sprint Commc'ns Co., L.P. v. APCC Servs.</u>, 554 U.S. 269, 273–74 (2008) (injury not redressable unless "it is likely and not merely speculative that plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit"). Here, the injunction sought by plaintiffs is neither necessary nor sufficient to redress plaintiffs' claimed injuries.

As plaintiffs' own submissions acknowledge, the Department is not the only regulatory entity scrutinizing Internet payday loans like those offered by plaintiffs. <u>See</u> Missouri Bank Letter, Shotton Decl. Ex. F (ECF No. 10-6) (citing recent regulatory scrutiny by "a number of federal and state agencies and private regulatory groups, such as NACHA" and "the number of [recent] initiatives by State Attorneys General and other enforcement officials, as well as other " in the payday lending industry); Brookes Decl. ¶¶ 28-32 (detailing recent enforcement efforts by California, Georgia, Minnesota, and Maryland regulators against online payday lenders). Nor is

it a secret that other regulators, especially those at the federal level, have been attempting to regulate online payday loans through focusing on the banks and payment processors that facilitate these transactions.  See Brookes Decl. ¶¶ 19-26 (describing known federal efforts to regulate "deceptive payday loans" and the financial intermediaries facilitating such transactions).

Here, even were defendants enjoined (as plaintiffs request) from interfering with plaintiffs' business, including from pursuing enforcement actions against third parties, these other state and federal entities would nevertheless remain free to continue their regulatory and enforcement efforts against lenders, banks and payment processors.  Furthermore, the fact that NACHA members have independent obligations to comply with NACHA rules to ensure that they do not facilitate the processing of financial transactions that would be void under relevant state law further undercuts plaintiffs' claims of causation and redressability.  Dubin Decl. ¶ 13 (NACHA rules); see Town of Babylon v. Fed. Hous. Fin. Agency, 699 F.3d 221, 229–30 (2d Cir. 2012) (no redressability where plaintiffs could not show that vacating federal agency-issued directives to banks was likely to impact actions of third party banks whose actions injured plaintiffs).

Under these circumstances, plaintiffs' requested injunction against defendants will not preclude other federal and state regulators from pursuing similar investigative and enforcement activity nor will it dictate the conduct of third-party banks and payment processors.  See Town of Babylon, 699 F.3d at 229–30; Butler v. Obama, 814 F. Supp. 2d 230, 241 (E.D.N.Y. 2011) (no standing where relief sought depended on discretionary actions of parties over whom court exercised no control).  In sum, because plaintiffs cannot satisfy the Article III standing requirements, there is no justiciable "case or controversy" before the Court, and plaintiffs cannot

demonstrate a reasonable likelihood of success on the merits.[5]

## II. PLAINTIFFS' GENERAL CLAIMS OF LOSS OR THREATENED LOSS ARE NOT SUFFICIENTLY PARTICULARIZED TO ESTABLISH IRREPARABLE HARM

A court must deny a preliminary injunction motion where the movant cannot show that it is likely to suffer an irreparable injury absent the requested injunction. Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999); Reuters, Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction"). Irreparable harm "must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages." Reuters, 903 F.3d at 907 (internal citations omitted); accord Borey v. Nat'l Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991) (mere possibility of harm is insufficient). Plaintiffs' assertions do not meet these demanding standards.

---

[5] Nor can plaintiffs show an "imminent" injury flowing from the Department's cease-and-desist letters to them directing them to stop issuing usurious loans to New York residents and stating that the Department would take "appropriate action to protect New York consumers" should they not comply. Cease and Desist Letters at 2 (Brookes Decl. Exs. 1-3). To establish an "imminent" injury sufficient to satisfy Article III's case-or-controversy requirement, plaintiffs bringing a pre-enforcement challenge must show "'an actual and well-founded fear that [the statute] will be enforced against [them].'" Port Wash. Teachers' Ass'n v. Bd. of Educ., 478 F.3d 494, 500 (2d Cir. 2007) (citation omitted; alterations in original); see also Hedges v. Obama, --- F.3d ---, 2013 WL 3717774, at *17 (2d Cir. July 17, 2013) (no standing to make pre-enforcement challenge to statute absent showing plaintiff "may *legitimately* fear that it will face enforcement under its *reasonable* interpretation of the statute") (emphasis added); cf. Laird v. Tatum, 408 U.S. 1, 13-14 (1972) (subjective fears of enforcement are insufficient to confer standing).

Here, plaintiffs cannot claim any such "actual and well-founded fear" of an enforcement action. If the doctrine of tribal sovereign immunity from suit extends to arms of the tribe (as plaintiffs claim), and if plaintiffs are (as they claim) *bona fide* arms of their respective tribes – two claims the Department assumes are true solely for this motion – plaintiffs would be entitled to tribal immunity from any direct enforcement action against them. (Of course, if tribal sovereign immunity does not extend to arms of the tribe, or if plaintiffs are not *bona fide* arms of their respective tribes, an enforcement action against them directly would not cause any injury to tribal sovereign immunity.) In this case, plaintiffs have not shown that an enforcement action against them in "certainly impending."

Plaintiffs claim that directly as a result of defendants' letters to banks and NACHA, payment processors and banks have given notice of their intent to stop servicing plaintiffs, or have sought to impose higher fees and more burdensome due diligence requirements, see Brandon Decl. ¶ 45 (ECF No. 12), and that "[t]he number of entities available to [plaintiffs] for necessary payment system access and day-to-day operations has dwindled to a dangerously low level," Compl. ¶ 44(d) (ECF No. 1).  From this, plaintiffs generally assert that the loss of their lending businesses will threaten overall tribal revenues thereby allegedly infringing their tribal sovereignty.  However, the actual evidence put forth by plaintiffs does not support these conclusory assertions.

First, plaintiffs have identified only a *single bank* — Missouri Bank — which has indicated that it will be terminating its relationship with a *single plaintiff* — American Web Loan.  See Missouri Bank Letter, Shotton Decl. Ex. F (ECF No. 10-6).  Besides this, plaintiffs have made absolutely no showing as to any particularized imminent harm that will be suffered by any of the other two plaintiffs' lending companies — Red Rock or Great Plains — or by plaintiff tribes as a whole.  See Brandon Decl. ¶ 41 (ECF No. 12) (conclusorily stating "[a] significant percentage of the Tribal Governmental Accounts are comprised of funds contributed by Great Plains and AWL").  Nor have plaintiffs explained why there are no other banks that may be willing to do business with them.  See, e.g., Manbeck v. Katonah-Lewisboro Sch. Dist., 403 F. Supp. 2d 281, 284 (S.D.N.Y. 2005) (defendant's failure to provide public busing which allegedly prevented plaintiff from being able attend school did not constitute irreparable harm where there were other alternative means of transportation); Heather K. v. City of Mallard, 887 F. Supp. 1249, 1259 (N.D. Iowa 1995) ("Irreparable harm will not be found where alternatives already available to the plaintiff make an injunction unnecessary.").  This falls far short of the

requisite "clear showing" that plaintiffs' continued business or tribal viability are at risk

sufficient to entitle plaintiffs to injunctive relief.  See Winter v. Nat'l Res. Def. Council, Inc.,

555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a *possibility* of

irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary

remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such

relief.") (emphasis added).

Second, with respect to the payment processors, plaintiffs have not provided evidence

that *any* payment processor has actually sought to terminate its relationship with plaintiffs.

Specifically, the recipient information for the letter purportedly from InterceptEFT stating its

intent to terminate its contract is redacted, and the Brandon Declaration which references the

InterceptEFT letter merely states that the payment processor has "notified several NAFSA

member tribes" but does not say whether plaintiffs were included.  See Brandon Decl. ¶ 45 (ECF

No. 12).

Plaintiffs' other submissions suggest that InterceptEFT has *not* sought to terminate its

relationships with plaintiffs, but rather may have directed one of the plaintiffs to "cease

submitting any transactions involving NY residents to InterceptEFT for processing."[6]  Pls.' Br. at

10.  If this is the case, plaintiffs have plainly not made any showing, clear or otherwise, why the

temporary cessation of offering loans in one state — New York — by one plaintiff lending

company would threaten the viability of all three of plaintiffs' lending businesses and of

collective tribal operations sufficient to infringe tribal sovereignty so as to constitute irreparable

harm.  See, e.g., AFA Dispensing Group B.V. v. Anheuser-Busch, Inc., 740 F. Supp. 2d 465

---

[6] This quoted language from plaintiffs' brief appears nowhere in either the Brandon Declaration or in the attached InterceptEFT letter itself.  Nor does paragraph 45 of the Brandon Declaration in fact refer to any of the plaintiffs; it merely states that InterceptEFT has contacted "several NAFSA member tribes."  See Brandon Decl. ¶ 45 (ECF No. 12).

(S.D.N.Y. 2005) (generalized allegations failed to demonstrate irreparable harm where plaintiffs did not provide "any indication of the number of employees that will be fired, the cost of the factory or specific partnerships that have been sacrificed" absent injunctive relief); cf. Seneca Nation of Indians v. Paterson, No. 10-cv-687A, 2010 WL 4027795, at *2 (W.D.N.Y. Oct. 14, 2010) (irreparable injury shown where tobacco tax threatened livelihood of 3,000 tribal employees and where tobacco profits were "virtually the only source of" tribal revenue).

III.    **A PRELIMINARY INJUNCTION WOULD NOT SERVE THE PUBLIC INTEREST AND IS NOT SUPPORTED BY EQUITABLE CONSIDERATIONS**

Plaintiffs ask the Court to enjoin defendants from discharging their regulatory duties to enforce state law.  Their requested injunction would deprive defendants of their discretion to decide whether to enforce state usury laws against plaintiffs' lending companies were facts to emerge that tribal sovereignty does not appropriately immunize them from prosecution. Plaintiffs' sought injunction would also preclude defendants from pursuing enforcement actions against third-party banks and other financial intermediaries who would otherwise fall within defendants' regulatory ambit, simply because such third parties may have contractual relationships with plaintiffs.

By contrast, this requested relief would confer no corresponding benefit on plaintiffs because other regulators would remain free to continue their efforts in targeting the online payday loan industry and the banks and payment processors that facilitate such activity.  See Section I.D.2, *supra*.  But it would deprive New York consumers of the protection of usury laws that were duly enacted by their legislature.  Indeed, defendants' actions in this case were motivated by their concern for New York consumers falling victim to online payday loans with exorbitant interest rates exceeding the usury caps set by the State legislature.  In light of the foregoing, it would, in short, be inequitable as to the parties here and against the public interest

24

to grant plaintiffs the injunctive relief they seek.  See <u>Maryland v. King</u>, 133 S. Ct. 1, 3 (2012)

(Roberts, C.J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating

statutes enacted by representatives of its people, it suffers a form of irreparable injury.'")

(citation omitted).

<u>**CONCLUSION**</u>

For the reasons set forth above, defendants respectfully requested that the Court deny

plaintiffs' instant motion for a preliminary injunction, together with such other and further relief

as the Court deems just and proper.

Dated: New York, New York
          September 3, 2013                         Respectfully submitted,
                                                    Eric T. Schneiderman
                                                    Attorney General of the State of New York
                                                    *Attorney for Defendants*

                                                    By:
                                                    _____s/_____
                                                    Garrett Coyle
                                                    Linda Fang
                                                    Assistant Attorneys General
                                                    120 Broadway, 24th Floor
                                                    New York, New York 10271