UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-30-13

THE OTOE-MISSOURIA TRIBE OF
INDIANS, et al.,

                       Plaintiffs,

-v-

NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES , et al.,

                       Defendants.

No. 13 Civ. 5930 (RJS)
MEMORANUDM & ORDER

RICHARD J. SULLIVAN, District Judge:

    Plaintiffs – federally recognized Indian Tribes in Oklahoma and Michigan (the "Tribes"), limited liability companies owned by the Tribes, and the Tribes' internal regulatory bodies – bring this action to establish their right to market and sell short-term, high-interest loans to New York residents over the Internet, and to permanently enjoin the New York State Department of Financial Services and its Superintendant (together, the "State") from interfering with Plaintiffs' lending activities. Now before the Court is Plaintiffs' motion for a preliminary injunction to temporarily prohibit the State from "pursuing or threatening to pursue any activities, including enforcement actions, that directly or indirectly interfere with [Plaintiffs'] consumer lending activities . . . or their lending business relationships." (Doc. No. 2 at 2.) For the reasons set forth below, Plaintiffs' motion for a preliminary injunction is denied.

I. BACKGROUND

A. Facts[1]

Plaintiffs provide online lending services through which clients in New York and other states may acquire short-term loans, often referred to as "payday" loans. (Mem. at 2–3; Opp. at 4.) The annual interest rate on these loans exceeds 100 percent and, in some cases, may top 1000 percent of the borrowed principal. (Decl. of Max J. Dubin, dated Sept. 3, 2013, Doc. No. 20 ("Dubin Decl."), ¶¶ 6–8, 14.)

For Plaintiffs, payday lending has been lucrative. Revenue from online lending generates almost half of the Plaintiff Otoe-Missouria Indian Tribe's (the "Otoe-Missouria's") non-federal revenue, and it has created dozens of new jobs for their members. (Decl. of John Shotton, dated Aug. 22, 2013, Doc. No. 10 ("Shotton Decl."), ¶¶ 23, 28.) Likewise, online lending revenue makes up forty-six percent of the operating budget of the Plaintiff Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Lac Vieux") and constitutes an essential resource for their government payroll and services. (Decl. of James Williams, Jr., dated Aug. 22, 2013, Doc. No. 11 ("Williams Decl."), ¶¶ 22–26.) In short, these lending operations have become an "increasingly vital component" of the Tribes' operating budgets. (Decl. of Barry Brandon, dated Aug. 22, 2013, Doc. No. 12 ("Brandon Decl."), ¶ 38; *see* Shotton Decl. ¶ 43.)

For the State of New York, however, payday loans pose a problem. As New York's high court has explained, "from time immemorial, [governments have sought to] protect desperately poor people from the consequences of their own desperation. Law-making authorities in almost all civilizations have recognized that the crush of financial burdens causes people to agree to

---

[1] The following facts are taken from the Complaint ("Compl."), as well as the declarations and exhibits filed in conjunction with Plaintiffs' memorandum of law in support of their motion for preliminary injunction ("Mem."), with the State's opposition ("Opp."), and with Plaintiffs' reply. In deciding this motion, the Court also considered the parties' memoranda and their statements at oral argument on September 11, 2013 ("Tr.").

almost any conditions of the lender and to consent to even the most improvident loans." *Schneider v. Phelps*, 391 N.Y.S.2d 568, 572 (1977); *see also Universal Credit Co. v. Lowell*, 2 N.Y.S.2d 743, 746 (N.Y. City Ct. 1938) ("The ostensible object of [New York's usury statutes] is to protect the weak, the needy, and the unwary from the rapacity of the avaricious.") Thus, to protect vulnerable borrowers, New York has outlawed high-interest loans through both civil and criminal anti-usury statutes. *See* N.Y. Gen. Oblig. Law § 5-501 (prohibiting annual interest above 16% on loans over $250,000); N.Y. Banking Law § 14-a (same); N.Y. Penal Law §§ 190.40–42 (criminalizing annual interest above 25%).

In February 2013, New York responded to consumer complaints about online usury by initiating an investigation into the online lending industry, and on August 5, 2013, the State moved to enforce New York's lending laws against online lending operations by sending cease-and-desist letters to Plaintiffs and thirty-two other online lenders, threatening "appropriate action to protect New York consumers." (Decl. of Debra Brookes, dated Sept. 3, 2013, Doc. No. 19 ("Brookes Decl."), ¶¶ 5, 8–10; Mem. at 6; Opp. at 6.) Specifically, the State accused Plaintiffs of "using the Internet to offer and originate illegal payday loans to New York consumers," in violation of "New York's civil and criminal usury laws." (Brookes Decl. Exs. 1–3.) The letters directed Plaintiffs to "confirm in writing" within fourteen days "that [Plaintiffs were] no longer solicit[ing] or mak[ing] usurious loans in New York." (*Id.*)

On the same day that the State sent cease-and-desist letters to Plaintiffs, it also sought assistance from the National Automated Clearing House Association ("NACHA") and 117 third-party banks that credit and debit payday loan payments, asking NACHA and the banks to help "stop illegal payday loans from entering into New York through the [Automated Clearing House

("ACH")] network."[2] (Opp. at 7; *see* Mem. at 6; Brookes Decl. Exs. 4–5.) The letters identified thirty-five payday lenders, including Plaintiffs, that the State believed were operating in New York, and stated that "[u]surious payday loans are illegal in New York, and such loans are void and unenforceable." (Brookes Decl. Ex. 4–5.) The letter also advised that the State would "aggressively pursue appropriate enforcement against payday lenders that refuse[d] to cease and desist from their illegal activity in New York" and that it would be in the banks' "long-term interest to take appropriate action to help ensure that [they are] not serving as a pipeline for illegal conduct." (*Id.*)

In response to the State's letter, on August 9, NACHA sent letters to its member banks that utilize the ACH network, notifying them that the State's allegations of illegal activity by Plaintiffs and other lenders placed the banks in jeopardy of violating state law, as well as NACHA's internal rules. (Brookes Decl. Ex. 6.) Since then, many of Plaintiffs' business partners have cut back or cut off entirely their financial dealings with the Tribes. (Brandon Decl. ¶¶ 45–46; Shotton Decl. ¶¶ 36–39; Williams Decl. ¶ 32.) For example, on August 9, 2013, InterceptEFT, a financial institution that had processed loan payments for the Tribes, notified Plaintiffs that it would terminate its relationship with them effective August 30. (Brandon Decl. Ex. D.) On August 16, 2013, citing regulatory enforcement from various government bodies, Missouri Bank, which processes payments for the Otoe-Missouria's lending operation, warned that the bank would cease providing "short-term, pay-day, and Internet lending" services to them in sixty days. (Shotton Decl. Ex. F.) Given the Tribes' heavy fiscal reliance on lending operations, these developments pose a potentially ruinous threat to the Tribes' financial viability. (Mem. at 11–12; Shotton Decl. ¶ 43; Williams Decl. ¶ 33; Decl. of David Bernick, dated Aug.

---

[2] The ACH network is an electronic payments network operated by NACHA by which the Tribes – and nearly all depository financial institutions – send and receive payments. The Tribes send funds to borrowers by issuing credits over the network and borrowers make debt payments by issuing a debit over the network. (Dubin Decl. ¶¶ 8–11.)

4

22, 2013, Doc. No. 9, ¶ 5; *see also* Decl. of Sherry Treppa, dated Aug. 22, 2013, Doc. No. 14, ¶¶ 30–31 (describing the "ruinous" effect of the State's actions on a California tribe).)

B. Procedural History

On August 21, 2013, Plaintiffs commenced this action by filing the Complaint, alleging that the State's effort to regulate Tribal lending is an affront to Plaintiffs' inherent sovereignty and violates the Indian Commerce Clause of the United States Constitution. (Doc. No. 1.) Two days later, Plaintiffs moved this Court to preliminarily enjoin the State from enforcing New York's anti-usury statutes against Plaintiffs. (Doc. No. 2.) Plaintiffs filed their brief in support of preliminary injunction on August 29, 2013 (Doc. No. 8), and the State filed its brief in opposition on September 3 (Doc. No. 18). The motion for a preliminary injunction was fully briefed as of September 6, 2013 (Doc. No. 24), and the Court heard oral argument on September 11 (Doc. No. 35).

II. DISCUSSION

The State opposes Plaintiffs' preliminary injunction motion on two grounds. First, the State contends that Plaintiffs lack standing to sue in federal court. Next, the State argues that Plaintiffs have not satisfied the Second Circuit's standard for a preliminary injunction. The Court addresses each of these issues in turn.

A. Standing

Article III, Section 2, of the United States Constitution delimits the federal judiciary's jurisdiction to include only certain cases and controversies. This "case or controversy" provision has been interpreted to require a party suing in federal court to demonstrate that (1) the party has suffered an injury that is (2) traceable to the complained-of conduct and that may be (3) redressed by the action sought from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). When the party suing is a Native American tribe, "actual infringements on [the]

5

tribe's sovereignty constitute a concrete injury sufficient to confer standing . . . [based on] the substantive interest which Congress has sought to protect in tribal self-government. This rule exists because tribes, like states, are afforded 'special solicitude in [a court's] standing analysis.'" *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)) (other citations, quotations, and alterations omitted). With respect to traceability and redressability, a plaintiff needs to show that its injury is "fairly traceable to the challenged action of the defendant [–] not the result of the *independent* action of some third party" – and that stopping the defendant's actions would therefore serve to mitigate or alleviate the harm. *Lujan*, 504 U.S. at 560–61 (citations omitted) (emphasis added). However, a plaintiff "need not show that a particular defendant is the *only* cause of their injury, and that, therefore, absent the [defendant's] activities, [the plaintiff] would enjoy undisturbed" existence. *Natural Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 (4th Cir. 1992) (emphasis added); *see also Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 346 (2d Cir. 2009), *rev'd on other grounds*, 131 S.Ct. 2527 (2011) ("[T]he requirement that plaintiff's injuries be 'fairly traceable' to the defendant's conduct does not mean that plaintiffs must show to a scientific certainty that defendant's [conduct] caused the precise harm suffered by the plaintiffs." (quotations and citations omitted)). Indeed, at this early stage of the litigation, "the [standing-causation] standard is not equivalent to a requirement of tort causation"; to the contrary, "the plaintiffs' 'burden . . . of alleging that their injury is "fairly traceable" to' the challenged act 'is relatively modest.'" *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (quoting *Bennet v. Spear*, 520 U.S. 154, 171 (1997)) (other quotations and citations omitted).

Here, Plaintiffs have alleged that the State is infringing the Tribes' sovereignty through both direct and indirect action and that this injury would be redressed by the declaratory and injunctive relief Plaintiffs seek. The State urges the Court to reject Plaintiffs' standing argument

because the State is not the sole actor seeking to curtail Plaintiffs' online lending activities. The State further reasons that, to the extent the State *has* acted, it has not directly caused Plaintiffs' injuries since NACHA and the banks are independent third parties that act of their own accord. (Opp. at 17–20.) Whether or not the State is "the only cause of [Plaintiffs'] injury" is beside the point. *Watkins*, 954 F.2d at 980. Plaintiffs need not show that the State is the only cause of the precise harm at issue here. *See Am. Elec. Power Co., Inc.*, 582 F.3d at 346. Likewise, it is not essential to standing that the State directly caused Plaintiffs' injuries. Standing to vindicate Indian tribal sovereignty is satisfied against the State so long as the third party that directly caused the tribe's injury was acting as a result of the state's actions rather than as a result of some independent motive. *See Mashantucket Pequot*, 722 F.3d at 463 (finding that a tax on slot-machine lessors that leased to tribes conferred standing on tribes to sue for injunction against the tax). Here, the allegations and the evidence assert that the State has directly infringed the Tribes' sovereignty through letters that command Plaintiffs to cease and desist from "illegal" lending, and that the State has indirectly infringed tribal sovereignty by sending letters to third-party financial services providers, insisting that Plaintiffs are breaking the law and that NACHA and the banks should forego aiding unlawful activity, which has in turn precipitated a rush to end business with Plaintiffs. (*See, e.g.*, Brookes Decl. Ex. 6. (NACHA letter warning that, "[i]n light of the allegations of the [State]," NACHA's member banks must review their lending activity to avoid breaking NACHA rules and state laws); Brandon Decl. Ex. D (InterceptEFT letter to Tribes, sent the same day as NACHA's letter, cutting off business with the Tribes due to "heightened regulatory attention to the online consumer lending industry"); Shotton Decl. Ex. F. (Missouri Bank's letter cutting off lending business with Otoe-Missouria due, in particular, to NACHA's warnings).) The Court is satisfied that Plaintiffs have set forth an infringement of the

7

Tribes' sovereignty for which the State was a cause and for which the Court's action could provide relief. Therefore, Plaintiffs have demonstrated standing to pursue this action.

B. Preliminary Injunction

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'" *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). In the Second Circuit, "a party seek[ing] a preliminary injunction against government action taken in the public interest pursuant to a statutory scheme . . . must demonstrate that (1) [it] is likely to succeed on the merits of the underlying claim, (2) [it] will suffer irreparable harm absent injunctive relief, and (3) the public interest weighs in favor of granting the injunction." *Pope v. Cnty. of Albany*, 687 F.3d 565, 570 (2d Cir. 2012) (citing *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)). "The Supreme Court also require[s] the plaintiff to show a fourth factor, that the balance of equities tips in his favor." *Id.* at 570 n.3. The Circuit has also indicated that the first requirement – likelihood of success on the merits – need not be shown if a plaintiff presents a "sufficiently serious question[] going to the merits to make [it] a fair ground for litigation and [the] balance of hardships tip[s] decidedly in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010). Because the Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits or presented a sufficiently serious question going to the merits, the Court need only address that issue. *See Person v. N.Y. Bd. of Elections*, 467 F.3d 141, 142 (2d Cir. 2006).

The merits question before the Court is whether Tribal lending services that are projected over the Internet into New York may be regulated by the State. This question implicates the unique legal framework that has developed in the course of this country's many controversial and often regrettable interactions with Native Americans. As a starting point, the Court recognizes that the Tribes are "'domestic dependent nations' that exercise inherent sovereign

authority over their members and their territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991) (quoting *Cherokee Nation v. Georgia*, 5 Pet. 1, 17 (1831)). Given the Tribes' sovereign status with respect to Tribal lands and members, the State's power to regulate activity will differ depending on where a statute applies and whom the statute targets. For example, absent specific permission from Congress, "states have no power to regulate the affairs of Indians on a reservation." *Williams v. Lee*, 358 U.S. 217, 220 (1959). On the other hand, "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973); *accord Grand River Enter. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 174 (2d Cir. 2005); *see also New York v. Shinnecock Indian Tribe*, 686 F.3d 133, 153–56 (2d Cir. 2012) (Hall, J., dissenting) (explicating the *Mescalero* holding with respect to off-reservation activity despite the panel's decision not to reach the merits). Between these two poles, if a state seeks to regulate non-Indians doing business with a tribe on the tribe's reservation, state law will apply "unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." *Mescalero*, 411 U.S. at 148; *see Okla. Tax Comm'n*, 498 U.S. at 512–13. Therefore, the first step in assessing the State's regulatory power is to determine whether the activity that the State is seeking to regulate is taking place on Tribal land or off it.

Plaintiffs have built a wobbly foundation for their contention that the State is regulating activity that occurs on the Tribes' lands. They explain that, when a consumer comes to their websites for a loan, the consumer "travel[s] to Tribal land via the Internet." (Mem. at 19.) In support of this conceit, Plaintiffs point out that (1) the Tribes own and control the lending websites, (2) the websites warn that loans are subject to tribal law and jurisdiction, (3) the "Tribal loan underwriting system" reviews loans, (4) loans are funded by Tribally-owned bank

9

accounts,[3] and (5) the Tribe's internal regulators regulate the loan process. (Mem. at 5; Shotton Decl. ¶¶ 20–21.) However, Plaintiffs overlook that none of these activities relates to the activity that the State is seeking to block. The State's action is directed at activity that takes place entirely off tribal land, involving New York residents who never leave New York State. These consumers are not on a reservation when they apply for a loan, agree to the loan, spend loan proceeds, or repay those proceeds with interest. (Opp. at 10; Dubin Decl. ¶¶ 6–8.) These consumers have not, in any legally meaningful sense, traveled to Tribal land. Therefore, to the extent the State seeks to prevent the Tribes from making loans to New York residents who are in New York, it is regulating off-reservation activity.

At least one court has faced this issue and agreed that online lending constitutes regulable off-reservation activity. In *Colorado v. Cash Advance and Preferred Cash Loans*, 205 P.3d. 389, 400 (Colo. App. 2008), the intermediate court of appeals for the State of Colorado determined the locus of tribal lending activity by applying a common five-part test from the Second Restatement of Conflict of Laws, looking to "where (1) the contract was entered into; (2) the contract was negotiated; (3) performance is to occur; (4) the subject matter of the contract is located; and (5) the parties reside." The court concluded that, because "the contracts were entered into and negotiated [off-reservation]; the loans [were to be] delivered to consumers [off-reservation]; and performance [would] occur [off reservation where] consumers [would] repay the principal and pay interest," the tribe's online lending operation was off-reservation activity. *Id.* at 400–01. The same analysis here would lead to the same conclusion – that the activity the State seeks to regulate is occurring off of Plaintiffs' Tribal lands.

The United States Court of Appeals for the Tenth Circuit considered a similar dispute in which Kansas sought to regulate a Utah lender that was making online loans to Kansas residents.

---

[3] The Court notes, however, that there is no basis in the record for concluding that the bank itself is on tribal land.

*Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1304 (10th Cir. 2008), *cert. denied* 129 S.Ct. 2062 (2009). Although the Utah lender did not have offices, employees, or any other physical presence in Kansas, the Tenth Circuit held that Kansas was regulating in-state activity inasmuch as the Utah lender was forging loan agreements with Kansas residents in Kansas with Kansas bank accounts. *Id.* at 1305, 1308–09. Although the Court recognizes that different constitutional provisions are at stake here – the Indian Commerce Clause rather than the Interstate Commerce Clause – the Tenth Circuit's analysis as to the locus of the regulated activity is compelling. Here, as in that case, the State seeks to regulate loan agreements that its residents enter into online, from within New York, and like the Tenth Circuit, this Court concludes that the State is thereby regulating in-state activity.

Plaintiffs attempt to obscure this plain logic by insisting that the State is engaged in an insidious and calculated campaign, targeting Tribal activity despite "no meaningful nexus" between the anti-usury statutes' enforcement and New York. (Mem. at 18; *see* Tr. at 34:10–25, 37:2–25.) The facts do not bear their argument. The State's aim is to protect New York consumers from predatory loans in New York, and the detrimental effect of the enforcement action on the Tribes is merely a collateral consequence of the laws' goal. *See Schneider*, 391 N.Y.S.2d at 572; (Brookes Decl. ¶¶ 3–8, Exs. 1–5; Tr. at 44:7–8.) There is simply no basis from which to infer that the target of New York's anti-usury laws is the Otoe-Missouria or the Lac Vieux, or that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents. *See* N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a; N.Y. Penal Law §§ 190.40–42.

The undisputed facts demonstrate that the activity the State seeks to regulate is taking place in New York, off of the Tribes' lands. Having identified no "express federal law" prohibiting the State's regulation of payday loans made to New York residents in New York, the

Tribes are subject to the State's non-discriminatory anti-usury laws. *Mescalero Apache*, 411 U.S. at 148–49; (Tr. at 8:1–15). Consequently, Plaintiffs have failed to demonstrate a likelihood of success on the merits or even a sufficiently serious question going to the merits of their underlying claims.

### III. CONCLUSION

Because the Court concludes that Plaintiffs have failed to demonstrate a likelihood of success on the merits or a sufficiently serious question going to the merits, Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction. Their motion is therefore DENIED. IT IS HEREBY ORDERED THAT, by October 11, 2013, the parties shall submit a joint letter addressing what discovery, if any, is required in this action. The parties shall also submit a joint proposed case management plan to the Court by that date. The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 2.

SO ORDERED.

Dated: September 30, 2013
New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE